### EVANS *et al.* v. BROWN *et ux.*

No. 1874.   Opinion Filed July 23, 1912.

(125 Pac. 469.)

1.   **BROKERS**—Authority—Acting for Both Parties.   A sale of real estate from which a substantial advantage has been derived cannot be sustained when he who actively promoted it acted as the ostensible agent for the vendor, when in reality he was the secret agent of the purchaser, unless it appears that the principal after full knowledge of all the facts confirmed the acts of the agent.

2.   **SAME** — Unauthorized Acts — Ratification—Evidence.   Evidence examined, and held sufficient to support the finding of the court below as to the scope of the agency, and that there was no confirmation by the principal after full knowledge of all the facts.

(Syllabus by the Court.)

*Error from District Court, Oklahoma County;*
*Geo. W. Clark, Judge.*

Action by W. F. Evans against C. S. Brown and wife. By cross-petition the St. Louis and San Francisco Railroad Company was made party defendant. Judgment for Brown and wife, and plaintiff and the railroad company bring error. Affirmed.

*W. F. Evans, R. A. Kleinschmidt,* and *J. H. Grant,* for plaintiffs in error.

*Burwell, Crockett & Johnson,* for defendants in error.

KANE, J: This was a suit commenced by L. F. Parker, and afterward revived in the name of W. F. Evans, the plaintiff in error, against the defendants in error, to reform a deed to a certain piece of real estate. The parties hereafter will be designated plaintiffs and defendants as they were designated in the court below. By way of answer and cross-petition the defendant C. S. Brown set up fraud on the part of his agent who negotiated the sale of the realty out of which the controversy arose, and prayed that the deed sought to be reformed be canceled and his title to the land cleared. Upon trial to the court a decree was entered in conformity with the prayer of the defendant, to. reverse which this proceeding in error was commenced.

The court below made general findings in favor of the defendants, and therefore every allegation of their cross-petition which is reasonably supported by the evidence must be resolved in their favor. The defendants C. S. Brown and Margaret Brown were husband and wife; the husband being the owner in fee simple of the lot involved. Some time prior to the execution of the deed sought to be canceled, Brown and one Poole, the local agent of the St. Louis & San Francisco Railroad Company, in Oklahoma City, had entered into an oral agreement, whereby Poole was to secure a purchaser for the land, for which service Brown was to pay the usual commission. Brown was unfamiliar with the value of properties in Oklahoma City, and in settling upon a price for the land he suggested to Poole that the land was worth $5,000, whereupon Poole said that in his judgment it was not worth over $4,000, and recommended that Brown take that amount for it, which proposition Brown finally accepted. Some four or five months before the execution of the deed, but subsequent to the agency of Poole, the general right of way agent for the St. Louis & San Francisco Railroad Company, upon the suggestion of Poole, advised his company to purchase the land for depot and terminal purposes. Several days prior to the contract of sale, Mr. Gray,

vice president of the company, instructed Mr. Poole, its local agent, and the agent of Brown for the purpose of negotiating the sale, to purchase the land for the railroad company, to be used for terminal and depot facilities. Shortly after the instructions of the vice president, the right of way agent appeared in Oklahoma City, and had a conversation with Mr. Poole in relation to the purchase of the land. At this conference Poole and Williams, the right of way agent, agreed that they would tell Brown they wanted the property for a broom corn warehouse. Poole then telephoned Brown that the man who wanted to purchase his property for a broom corn warehouse was in town. Brown inquired where he could meet the prospective purchaser and talk with him. Poole answered that it would not do for Brown to see the purchaser, because he might "queer the whole deal," that he (Poole) would arrange a meeting at the Indiahoma Club at, or a little after, noon of that day. Pursuant to this arrangement, Brown and the right of way agent were introduced by Poole, whereupon Brown asked the right of way agent what his business was, who answered that "he had no particular business now; that he was a retired capitalist." Brown then asked him what he desired this property for, and he said he wished to acquire it for the purpose of building a broom corn warehouse upon it. They (Brown, Poole and the right of way agent) discussed the price and other details of the trade, and Brown agreed to take $4,000, whereupon the right of way agent then suggested that they go to the office of his attorneys for the purpose of having the necessary papers prepared. On the way to the office of the attorneys, who, it transpires, were also the attorneys of the railway company, Brown again asked Williams what he wanted this property for, and was again assured that he wanted it for the purpose of building a broom corn warehouse thereon. When they reached the attorneys' office, Brown was left sitting in the reception room, and Poole and the right of way agent retired to one of the private offices, and after consulting with a member of the firm, came out with a contract drawn, prepared for signature, wherein it was agreed that Brown should sell the property to one Enderline, who was at that time

a clerk in the attorney's office. Poole had with him cash belonging to the railroad to the amount of $200, which money was paid to Brown. A draft was drawn by Williams as the general right of way agent for the St. Louis & San Francisco Railroad Company, and handed to Brown with the request that he indorse the same, which he did, taking it, according to his testimony, to be simply a receipt for the money paid at that time. While they were in the attorney's office, and before the money was paid, Brown again asked Williams what he wanted this property for, and insisted that he desired to know absolutely what the property was to be used for, and was again assured that the property was going to be used for the purpose of building a broom corn warehouse thereon. Poole was present during this conference and confirmed all the right of way agent said pertaining to the purpose for which the property was being purchased. Several days after this Poole telephoned Brown that he had the draft to pay the balance of the purchase price, whereupon Brown went to a bank designated by Poole for the purpose of closing the deal, where the deed was delivered to Poole by Brown, who executed the deed and laid it down on the desk. Poole delivered to Brown a voucher issued by the St. Louis & San Francisco Railroad Company with a draft for $3,800. Poole's version of what took place at that meeting is hereinafter set out in full. The deed executed by Brown and delivered to Poole conveyed the property to L. F. Parker, who at that time was at the head of the legal department of the railroad company. Subsequently Parker died, and W. F. Evans, his successor, caused the suit to be revived in his name.

The evidence also tends to show that at the time of the sale of the land its reasonable value was in the neighborhood of $10,000.

The cross-petition of the defendants substantially set up the foregoing facts. Originally the railroad company filed a disclaimer and afterwards admitted that it was the real purchaser of the land, and that it was being held for its use and benefit by Mr. Evans, its general counsel.

Counsel for plaintiffs in error present their contentions under three subheads, as follows:

"(1)   The alleged false representations complained of, and which were to the effect that the property was being purchased for a broom corn warehouse, and that Williams was a capitalist, and the purchaser, were not material.   (2) Poole's employment did not constitute him anything more than a mere middleman, whose duty it was to find a purchaser.   He was not clothed with any discretion in the premises, and his employment by plaintiffs' herein was not fraudulent or against public policy.   (3) Conceding, for the purposes of this argument, that everything defendants have alleged is true, still they are not entitled to the relief prayed for by them.   Having discovered the alleged fraud while the contract was still executory, and having voluntarily elected to complete it, they thereby waived the alleged fraud and are estopped from setting it up in impeachment of said contract."

A mere statement of what the court considers the established facts practically disposes of the first two assignments of error.   No principle is better settled than that a man cannot be the agent of both the seller and the buyer in the same transaction, without the intelligent consent of both.   Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity, and ability is the main consideration in the selection of agents; and so careful is the law in guarding this fiduciary relation that it will not allow an agent to act for himself and his principal, nor to act for two principals on opposite sides in the same transaction.   In such cases the amount of consideration, the absence of undue advantage, and other like features are wholly immaterial.   Nothing will defeat the principal's right of remedy, except his own confirmation, after full knowledge of all the facts.   Actual injury is not the principle upon which the law holds such transactions voidable. The chief object of the principle is not to compel restitution where actual fraud has been committed, or unjust advantage gained, but it is to prevent the agent from putting himself in a position in which to be honest must be a strain on him, and to elevate him to a position where he cannot be tempted to betray his principal. *Hunter Realty Co. et al. v. Spencer et al.,* 21 Okla. 155, 95 Pac. 757, 17 L. R. A. (N. S.) 622; *Ferguson v. Gooch,* 94 Va. 1, 26 S. E. 397, 40 L. R. A. 234; *Conkey v. Bond,* 36 N. Y. 427; *Davis v. Hamlin,* 108 Ill. 39, 48 Am. Rep. 541; *Henderson et al. v. Vin-*

*cent,* 84 Ala. 99, 4 South. 180. In *Hunter Realty Co. et al. v. Spencer et al., supra,* a case similar in principle to the one at bar, it was held:

"Where an agent acts for both parties in making a contract requiring the exercise of discretion, the contract is contrary to public policy, and voidable in equity upon the application of either party."

So well settled is the foregoing principle that its soundness is not controverted by counsel for plaintiffs in error. But they contend that the case at bar falls within an exception to the general rule equally well established by the authorities, to the effect that the maxim that "no man shall serve two masters" does not prevent the same person from acting as agent for certain purposes for two or more parties to the same transaction when their interests do not conflict, and where loyalty to the one is not a breach of duty to the other. *Nolte v. Hulbert,* 37 Ohio St. 445. A great many cases are cited in support of the exception. Another test for determining whether a case falls within the general rule or the exception is quoted from *Southack v. Lane,* 23 Misc. Rep. 517, 52 N. Y. Supp. 688, as applicable to the facts in the case at bar:

"Where he (the agent) acts simply as a middleman to bring the parties together, and takes no.part whatever in the negotiations, there will be nothing illegal in his acting for both parties, and claiming remuneration from each."

None of the foregoing tests applies to the case at bar. In the first place, the evidence tends to prove that the defendant relied upon the judgment of Poole in fixing the price of the lot, and was influenced by his suggestions on that point at the time the contract of agency was entered into and all through the following negotiations. The defendant told Poole that he thought the land was worth $5,000, which, the evidence discloses, was about one-half its value; but Poole insisted that the land was only worth $4,000, which value the defendant finally adopted. On this question the defendant testified:

"I finally made a price of $4,000; told him to get over $4,000 if he could, and left it with him."

It is difficult to harmonize this conduct on the part of Poole with loyalty to Brown. Poole undoubtedly knew that the land was worth a great deal more than the price he induced Brown to place upon it. Contrast his conduct with S. H. Brown, another owner of property adjoining the lot in controversy and to whom he owed no duty, and his conduct with his principal, the defendant in this case. The day before the meeting of Brown, Poole, and the right of way agent, at which the contract of sale was executed, Poole had a conversation with Mr. S. H. Brown pertaining to the purchase of the property by the railway company, concerning which Mr. S. H. Brown testified:

"He (Poole) says: 'I have known you quite a while, and believe you to be a business man, and you will not impose on us, and I will tell you frankly what we want. We want to buy that property of yours, that storage property in block B.' He says, 'I haven't been so frank with anybody along the line, and I ask you to keep this to yourself,' and then he gave me a little outline of their plans. He wanted to purchase this line of property for the purpose of putting in a depot. The purpose was to come in the block west of us, which would be block C. I said: 'By the way, I know the owner of that property, Mr. Brown, and, if I can be of any service to you, I would be glad to.' He says: 'No, I know him too. The property is listed with me. You don't need to trouble about it.' He says: 'We can get that at a very reasonable price, putting it up to Brown that we are going to put a broom corn warehouse on the property.'"

The evidence further shows that S. H. Brown received $20,000 for his property, $2,000 of which was allowed for the buildings thereon. In the face of such evidence, we do not see how it can be said with any show of reason that the interests of the defendant and the railway company were not in conflict, or that the loyalty of Poole to the railway company did not constitute a grave breach of duty to the defendant. Thus it appears that the first test invoked by counsel for plaintiffs in error fails.

The second one seems to us equally as inapplicable. It seems that, instead of taking "no part whatever in the negotiations," Poole took a very active part therein. The evidence shows that, when the right of way agent arrived to close up the deal,

Poole telephoned to defendant of his arrival and warned defendant not to see him alone, "because he might queer the deal." And the evidence further tends to show that Poole was present at all conferences between the right of way agent and the defendant, and actively participated in deceiving the defendant as to the facts. Instead of forwarding the negotiations between Brown and the railway company in the interest of his principal, he forwarded them in the interest of the railway company. He was bound to disclose to his principal all facts open to his knowledge material to the matter in which he was employed. He not only concealed material facts, but by direct false statements did everything in his power to mislead and deceive the defendant. Paraphrasing a sentence from *Young v. Hughes et al.,* 32 N. J. Eq. 372, a case resembling this in a great many particulars, it is impossible to read the testimony without concluding that the skill and experience of Poole were not exerted for, but rather against, his principal. It is well settled that no sale from which a substantial advantage has been derived can be sustained when he who actively promoted it, acted as the ostensible agent for the vendor, when in reality he was the secret agent of the purchaser. *Donovan v. Campion et al.,* 85 Fed. 71, 29 C. C. A. 30.

On the next proposition there is considerable evidence tending to support the contention of counsel for plaintiffs in error, but there is also evidence reasonably tending to support the findings of the court thereon. That being so, this court is not called upon to weigh the evidence. It is unnecessary to notice in detail the evidence on this point. It is clear that up to the time the deed was delivered the defendant was deceived as to the true condition of affairs by the false statements of one whom he had a right to believe. After the deed was delivered, the defendant evidently became suspicious that something was wrong, but that he confirmed what had been done after full knowledge of all the facts is not at all apparent. As to what transpired at the time the deed was delivered, Mr. Poole testified:

"As I remember, I laid the voucher and draft out on the counter. He laid the deed down also. We stood there and talked a minute or two, and Mr. Brown signed the voucher, and

I witnessed it right there, L. T. Poole. I took up the deed, Mr. Brown took up the draft for $3,800, and Mr. Brown said the property was too cheap; he had been stung."

It is upon the fact that the consideration was paid with drafts of the railway company, and the statement by Brown that he had been stung, that counsel principally base their contention that the defendant elected to waive the alleged fraud after discovering the same, and is therefore estopped from setting it up in impeachment of the deed. We cannot agree with counsel. While it may be true that defendant discovered facts which made him suspicious of the good faith of his agent, there is nothing to show that he had possession of sufficient facts to enable him to determine just how and by whom he had been deceived and what his rights in the premises were. The railway company was at all times denying that it had any interest in the land, and a year and six months after the commencement of the proceedings, and some considerable time after the defendant filed his answer and cross-petition, it solemnly "disclaims any interest in this suit and denies that it is the proper party defendant in this cause." It is apparent that at that time the officers and the legal department of the railway company were of the opinion that what had transpired tending to inform the defendant of the true situation was not sufficient to establish its connection with the transaction. On the whole, we are of the opinion that there is evidence reasonably tending to show that the defendant, in due time after the discovery of the fraud practiced upon him, sought the relief to which he was entitled, and did not by delay and vacillation waive his right to a rescission of the sale and a cancellation of the deed upon the ground of the fraud of his agent.

The judgment of the court below must therefore be affirmed.

TURNER, C. J., and HAYES and DUNN, JJ., concur; WILLIAMS, J., absent, and not participating.