Bruce J. FREY, Plaintiff–Appellant,

v.

FRASER YACHTS; David Fraser, Inc.; Budel, Inc.; C–Bench Investments, Inc.; Carnor, Inc.; and Norman McCarvill, Defendants–Appellees.

No. 93–3698.

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1994.

Decided July 15, 1994.

William E. Rattner (argued), Jay Erens, Adam M. Kingsley, Hopkins & Sutter, Chicago, IL, for plaintiff-appellant.

Donald J. Moran (argued), Cynthia M. Baruck, Pedersen & Houpt, Chicago, IL, for Fraser Yachts, Inc., David Fraser, Inc., Carnor, Inc., Budel, Inc., C–Bench Investments, Inc.

Sheldon Davidson, Donald J. Moran, Cynthia M. Baruck, Pedersen & Houpt, Chicago, IL, for Norman McCarvill.

Before ESCHBACH, EASTERBROOK, and KANNE, Circuit Judges.

ESCHBACH, Circuit Judge.

Is a yacht broker entitled to keep his commission from the seller when, on the eve of closing but after execution of the purchase agreement, the seller discovers that the bro-

ker is to receive a commission from the buyer as well? The defendants think so, but we disagree. For the reasons below, we reverse the district court's order of summary judgment for the defendants and remand for further proceedings consistent with this opinion.

Plaintiff Bruce Frey is a Chicago real estate developer who wanted to sell his 127–foot high-speed motor yacht, the Dale R II.[1] In pursuit of a buyer in what must be a rather limited market, in January 1987 Frey engaged defendant Fraser Yachts, a Florida partnership, to sell his yacht. Fraser Yachts' Norman McCarvill[2] was to act as Frey's broker. The brokerage agreement was limited to six months, although the parties continued their relationship until Frey ultimately sold the Dale R II in November 1989.

On September 27, 1989, McCarvill faxed Frey an offer for the Dale R II from Mr. and Mrs. Donald Flynn. The Flynns offered Frey $5.5 million in cash, plus their 72–foot Hatteras motor yacht, the "Battered Bull," in trade. In a letter to McCarvill in which he twice referred to the Flynns as "your clients," Frey rejected the Flynns' offer. Although Frey was reluctant to take another boat in trade, at McCarvill's urging he did make a counter-offer of $5.7 million in cash plus the Battered Bull. The Flynns split the difference and offered $5.6 million plus the Battered Bull. Frey accepted their counter-offer on October 13, 1989. Frey and McCarvill then agreed that Frey would pay McCarvill and Fraser Yachts a $400,000 commission on the cash portion of the deal and pay the remainder of McCarvill's commission when Frey sold the Battered Bull. Unbeknownst to Frey at the time, McCarvill also represented the Flynns and stood to receive a commission from them as well.

After these preliminary negotiations, Frey hired Benton Strauss, a Chicago attorney, to assist with the sale of the Dale R II. Strauss was given the power to sign and execute all documents necessary to the sale of the Dale R II, although Frey instructed Strauss not to negotiate or discuss price or commissions with any of the parties. Frey also hired Paul Amend, a boat inspector, to inspect and appraise the Battered Bull. Amend testified in deposition that Frey told him that McCarvill was "the broker offering [the Battered Bull] in trade," although Frey disputes this.

On November 1, 1989, after Frey and the Flynns signed their purchase agreement, Herman Jeffer, the Flynns' attorney, sent the Flynns a letter explaining that they would owe Fraser Yachts a $100,000 commission. Jeffer sent Strauss a copy of this letter on November 2, 1989, and a draft of the closing statement a few days prior to the November 7, 1989 closing date. The closing statement also mentioned the Flynns' $100,000 commission to Fraser Yachts. Frey did not personally receive these two documents until after the closing.

On November 7, 1989, the parties closed the deal. At the closing, Frey states that for the first time he heard Jeffer ask Flynn if he (Jeffer) should give McCarvill his commission check. A bit puzzled by Jeffer's reference to a commission check, after the closing Frey telephoned Strauss. Strauss informed Frey that he had received the documents mentioning the commission, but did not communicate their contents to Frey because of Frey's earlier instructions.

As a result of McCarvill's undisclosed dual agency, Frey sued Fraser Yachts[3] and McCarvill for breach of their fiduciary duty, for an accounting from the defendants, and for misrepresentation. The district court had jurisdiction over Frey's complaint pursuant to 28 U.S.C. § 1332(a) (diversity jurisdiction). After cross-motions for summary judgment, the district court granted sum-

---

1. Actually, Frey owned all the shares in Dale R II, a Grand Cayman corporation which owned the boat named the Dale R II. For our purposes, however, it matters not that Frey technically sought to sell a corporation rather than a boat.

2. McCarvill was an owner of Carnor, Inc., a partner in Fraser Yachts.

3. The remaining defendants, David Fraser, Inc., Carnor, Inc., Budel, Inc., and C–Bench Investments, Inc. are all general partners of Fraser Yachts.

mary judgment on the breach of fiduciary duty claim and the accounting claim to defendants.[4] The district court reasoned that because Strauss knew of Fraser Yachts' $100,000 commission from the two documents Jeffer sent Strauss, Frey as Strauss's principal could also be imputed with knowledge of McCarvill's dual agency. Therefore, the district court concluded that Frey knew of the dual agency prior to closing the transaction. We have jurisdiction over this appeal under 28 U.S.C. § 1291.

We review the district court's grant of summary judgment *de novo. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In our review of the record, we must draw all inferences in a light most favorable to the non-movant. *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991) (citations omitted). If we find a genuine issue as to any fact which might affect the outcome of the case, summary judgment will have been inappropriate and we will reverse. *Id.*[5]

█ It is black letter law that as Frey's broker and fiduciary, McCarvill owed Frey a duty of loyalty. *Moehling v. W.E. O'Neil Constr. Co.*, 20 Ill.2d 255, 170 N.E.2d 100, 107 (1960); *Young v. Field*, 548 So.2d 784, 786 (Fla.Dist.Ct.App.1989). Perhaps the most important component of this duty of loyalty is a broker's "legal obligation to inform [his principal] with *fairness, promptness and completeness* concerning all facts within his knowledge which are, or may be, material to the situation in connection with his employment." *Kline v. Pyms Suchman Real Estate Co.*, 303 So.2d 401, 404 (Fla.Dist.Ct.App.1974) (emphasis added), *cert. denied*, 314 So.2d 588 (Fla.1975); *see also Jeffrey Allen Indus., Inc. v. Sheldon F. Good & Co.*, 153 Ill.App.3d 120, 106 Ill.Dec. 313, 315, 505 N.E.2d 1104, 1106 (1987). It is axiomatic, then, that a broker cannot act as the representative for both buyer and seller in the same transaction unless both parties are fully aware of such dual representation and consent to it. *See Young*, 548 So.2d at 786 (citing *Stinson v. Teelin Real Estate, Inc.*, 370 So.2d 1205 (Fla. Dist.Ct.App.1979)); *see also Quest v. Barge*, 41 So.2d 158, 160 (Fla.1949) ("There may be instances . . . where one may be agent of the two contracting parties; but this can occur only upon the fullest disclosure by the agent of this fact, and the fullest comprehension of it by those contracting through the medium of such agent."); *Panorama of Homes, Inc. v. Catholic Foreign Mission Soc.*, 84 Ill. App.3d 142, 39 Ill.Dec. 513, 519, 404 N.E.2d 1104, 1110 (1980). If a broker fails to disclose his dual representation and obtain the respective parties' consents, he forfeits his commission. *See Stinson*, 370 So.2d at 1206; *Duffy v. Setchell*, 38 Ill.App.3d 146, 347 N.E.2d 218, 222 (1976).

██ Notwithstanding an agent's strict duty to his principal, the defendants argue that if a principal manifests knowledge of and consents to an agent's conflict of interest, the agent need not disclose his conflicts of interest to him. *See Quest*, 41 So.2d at 160. Quoting The American Law Institute's Restatement of Agency, the Florida Supreme Court stated:

> "An agent who acts for adverse principals in a transaction is subject to a duty to act with fairness to each, and to disclose to each all facts which he knows or should know would reasonably affect the judgment of each in permitting such dual agency, *except as to a principal who had manifested that he knows of such facts or that he does not care to know of them.*"

> · · · · ·

> "One employed as agent violates no duty to the principal by acting for another party to the transaction if he makes a full disclosure of all relevant facts which he knows

4. Frey voluntarily dismissed the two counts of his complaint alleging misrepresentation.

5. In the district court the parties disputed whether Florida or Illinois law governed their dispute. The district court did not resolve this issue, concluding that it made no difference to the resolution of this case because the relevant law is the same in both states. Frey urges us to apply Florida law, and the defendants agree on appeal with the district court's conclusion that whether Illinois or Florida law applies is of no consequence. We agree that an agent's duties are substantially the same in either jurisdiction and therefore we need not decide whether Illinois or Florida law governs.

or should know, *or if the principal otherwise knows of them and acquiesces in the agent's conduct.*"

*Id.* (Emphasis supplied.)[6] The defendants allege both that Frey manifested knowledge of McCarvill's dual agency and that Frey had imputed knowledge of and implicitly consented to McCarvill's dual agency prior to closing.[7]

■ As evidence of Frey's actual knowledge, the defendants cite a litany of facts, only two of which have any apparent relevance. They first point to Frey's letter to McCarvill in which he twice referred to the Flynns as "your clients." The district court inferred from Frey's use of the phrase "your clients" that Frey knew McCarvill represented the Flynns. However, in his deposition Frey testified that he merely meant that the Flynns were the buyers, not that McCarvill represented them. There are many possible inferences one could draw from Frey's description of the Flynns as McCarvill's "clients," and although a jury *might* question Frey's choice of words, the inference most favorable to Frey is that he was merely referring to the individuals McCarvill had produced as potential buyers. Therefore, Frey's letter does not conclusively prove that Frey had actual knowledge of McCarvill's dual representation. Moreover, even if we

agreed that Frey's use of the phrase "your clients" suggested that he knew McCarvill represented the Flynns in this particular transaction, there is nothing in the record to show that McCarvill explained *all* the relevant details of his dual representation, including the commission the Flynns were to pay, how long he had represented them, or any other information prior to the time Frey executed the purchase agreement with the Flynns. *See Moehling*, 170 N.E.2d at 107 ("disclosure must include not only the fact that the agent is acting on his own account, but also all other facts which he should realize have or are likely to have a bearing on the desirability of the transaction from the viewpoint of the principal") (quoting Restatement of Agency, sec. 390, Comment a). The rules governing dual agency disclosure are designed to enable the principals to make sound, fully informed decisions. McCarvill should not have relied on Frey's possibly careless choice of words to mitigate his duty of disclosure.

■ The defendants also point to boat inspector Paul Amend's statement that Frey told him that McCarvill represented the Flynns. Frey disputes that he made the latter statement, and our review of the record reveals only that Amend testified in deposition that Frey told him that McCarvill

6. The defendants also cite *Cole v. Brundage*, 36 Ill.App.3d 782, 344 N.E.2d 583, 593 (1976). At first glance *Cole* might appear to deal with similar facts, but in *Cole* the case was in the exact opposite procedural position to the case at bar. There, the agent prevailed in the trial court, and the principals appealed the district court's denial of their motion for judgment notwithstanding the verdict. Therefore, the appellate court properly viewed *the facts in a light most favorable to the agent*, while here we read the facts in a light most favorable to the principal. Moreover, the facts in *Cole* make clear that the agent properly acted in good faith and was the victim of unscrupulous principals. On the facts we have, read in a light most favorable to Frey, this is not the case here.

7. Although the defendants refer to the closing date as the relevant date prior to which Frey had knowledge of McCarvill's dual agency, we disagree. *See infra.* Nevertheless, even the notice given to Frey prior to the closing date is suspect. Although there is some intimation Frey knew McCarvill had represented the Flynns in their *purchase* of the Battered Bull, there is no evidence McCarvill or anyone from Fraser Yachts

*explicitly and directly* told Frey that McCarvill and Fraser Yachts represented the Flynns in *this* particular transaction, as a diligent agent might have done. Frey's knowledge about McCarvill's dual representation, if he had any at all prior to the closing date of November 7, came only indirectly or through imputation. Given the strictness of an agent's duty to his principal, an agent should not rely on speculation or conjecture to reassure himself that his principal knows about material conflicts of interest. As both Illinois and Florida precedent make clear, a broker has an *affirmative obligation* to disclose all relevant information to his principal which might affect his decision. Nevertheless, we recognize that if Frey manifested knowledge of the relevant facts concerning McCarvill's dual agency, McCarvill could properly infer that his principal knew and consented to his dual agency. However, reading the facts in a light most favorable to Frey, we do not think McCarvill could have reasonably relied on Frey's statements as an indication that Frey knowingly and intelligently consented to McCarvill's dual agency.

was "the broker offering [the Battered Bull] in trade." Frey denies making this statement, but even if he did, the most favorable inference to Frey is that he meant that McCarvill, as the broker, brought buyers to Frey who had offered the Battered Bull in trade. Amend's testimony is simply not definite or unambiguous enough to support summary judgment for the defendants on the grounds that Frey actually knew McCarvill represented the Flynns, especially in light of Frey's denial that he made the statement. Moreover, the defendants do not assert that McCarvill or anyone at Fraser Yachts knew what Frey said to Amend. Therefore, although it might be relevant evidence of Frey's actual knowledge, it is not sufficient under *Quest* to relieve McCarvill and Fraser Yachts of their duty to disclose material conflicts of interest to their principal.[8] At the very least, there is a genuine issue of material fact as to Frey's actual knowledge.

█ Even if Frey did not have actual knowledge, the defendants assert that through his attorney Strauss, Frey had imputed knowledge of McCarvill's dual representation based on the copied letter and draft closing statement sent to Strauss, both of which mentioned the Flynns' $100,000 commission to McCarvill. *See Curtis, Collins & Holbrook Co. v. United States,* 262 U.S. 215, 222, 43 S.Ct. 570, 572, 67 L.Ed. 956 (1923); *Kuska v. Folkes,* 73 Ill.App.3d 540, 29 Ill.Dec. 399, 402, 391 N.E.2d 1082, 1085 (1979) ("a principal is deemed to have knowledge of all material facts of which his agent receives notice or acquires knowledge, while acting in the course of his employment and the scope of his authority"); *Ruotal Corp., N.W., Inc. v. Ottati,* 391 So.2d 308, 309 (Fla.Dist.Ct.App. 1980) ("It is axiomatic that knowledge of the agent constitutes knowledge of the principal as long as the agent received such knowledge while acting within the scope of his authority."). Frey responds that the information concerning the Flynns' commission Strauss

received was not "in the scope of Strauss's authority" because Strauss had no authority to negotiate the commission or other financial details. We disagree. Notwithstanding the fact that Strauss may not have been permitted to negotiate the commission or other financial matters, the Power of Attorney executed by Frey to Strauss demonstrates that receiving letters relating to the transaction was well within Strauss's scope of authority. The Power of Attorney gave Strauss power to "arrange for the sale of the [Dale R II] and to sign all documents necessary or appropriate to accomplish this; [and] *take all other actions and sign all other documents necessary or appropriate in order to sell, or ancillary to the sale of, the [Dale R II]."* (Emphasis supplied.) Therefore, we agree with the defendants that Frey had imputed knowledge of the Flynns' intent to pay Fraser Yachts a commission.

█ However, even though Frey had imputed knowledge of Fraser Yachts' commission from the Flynns, the knowledge came too late and could scarcely be characterized as "complete" disclosure. *See, e.g., Quest,* 41 So.2d at 162 ("in view of the relations between [the agent] and [the principal] previous to and at the time of the contract, it was not, I think, the [principal's] duty to suspect and inquire, but it was [the agent's] duty to disclose and explain") (citing *Marsh v. Buchan,* 46 N.J.Eq. 595, 22 A. 128, 129 (1890)). A broker has an obligation to disclose any conflicts of interest to his principal promptly—generally before the principal enters into a contract in which the broker has a conflict of interest. *Ehringer v. Brookfield & Assocs., Inc.,* 415 So.2d 774, 776 (Fla.Dist. Ct.App.1982); *Kline,* 303 So.2d at 404; *Moehling,* 170 N.E.2d at 107. McCarvill therefore had an obligation at the time he contacted Frey about the Flynns' offer to tell Frey that he also represented the potential buyers and that his interests would be divided. It was at this time that McCarvill's

---

8. The defendants also point to Frey's extensive experience in the real estate field. While we agree that Frey's background is a relevant fact, we do not agree that it is either dispositive or that it necessarily supports the defendants' position in this case. Frey's sophistication could prove either that he should have known better, or

that based on his experience, he knew that brokers have a duty to disclose conflicts. In the absence of a full and forthright disclosure, Frey, as an experienced real estate developer, would have no reason to suspect McCarvill was acting as a dual agent.

conflict arose, giving Frey the right to know all the relevant facts to enable him to make informed judgments at all stages of the transaction. In this case, Strauss received Jeffer's letter only *after* Frey had entered into the purchase agreement with the Flynns. Jeffer's letter came too late because Frey was already contractually bound. Moreover, the information Frey knew through imputation cannot be characterized as complete. Complete disclosure would have required not only the fact and amount of the commission, but also the parameters and history of McCarvill's relationship with the Flynns and any other relevant facts Frey might need to know to make intelligent, knowing decisions. *See Moehling,* 170 N.E.2d at 107.[9]

 Citing *Quest,* the defendants contend that if McCarvill truly did not notify Frey of his dual agency, Frey could have repudiated his purchase agreement with the Flynns. The defendants seem to believe Frey's remedy of repudiation excuses McCarvill's failure to timely notify Frey of his dual agency. They are incorrect. *Quest* holds that a " 'contract made by one individual as the agent of both parties is not void, but only voidable, at the election of the principal,' " *Quest,* 41 So.2d at 163 (quoting *Greenwood v. Spring,* 54 Barb.Ch. 375 (N.Y.Ch. 1857)). However, nowhere does *Quest* intimate that repudiation is the principal's *only* remedy. A principal may also sue for return of an agent's commission when the agent breaches his fiduciary duty. *Stinson,* 370 So.2d at 1206; *Young,* 548 So.2d at 786 & n. 4. Agency law is designed not only to remedy damages suffered by the principal, it is also intended to remove any temptation an agent might have to breach his fiduciary duties by acting against a principal's best interests. *See Quest,* 41 So.2d at 164 (" 'The chief object of the principle [of agency] is not to compel restitution where actual fraud has

been committed, or unjust advantage gained, but it is to prevent the agent from putting himself in a position in which to be honest must be a strain on him, and to elevate him to a position where he cannot be tempted to betray his principal.' ") (quoting *Evans v. Brown,* 33 Okla. 323, 125 P. 469, 470 (1912)). Moreover, even if Frey could have repudiated his purchase agreement with Flynns, his rights to repudiation were not so clearly established that a suit by the Flynns for specific performance or damages would have been unimaginable.[10] Frey's right to repudiate his contract does not excuse McCarvill's failure to timely notify Frey.

Because we believe there are genuine issues of material fact in dispute with respect to both Frey's actual or imputed knowledge of McCarvill's dual agency and McCarvill's fulfillment of his fiduciary duties, we RE-VERSE the district court's order of summary judgment for the defendants and REMAND for proceedings consistent with this opinion.

---

**9.** Frey's imputed knowledge notwithstanding, McCarvill should *not* be permitted to rely on the fortuity of Jeffer's disclosure to Frey. Jeffer's letter was directed to the Flynns, not Frey. Moreover, is not clear whether either McCarvill or Fraser Yachts even knew that Jeffer sent the letter. Therefore, under *Quest* they could not rely on it to relieve them of their fiduciary duties.

**10.** The defendants' very own case, *Duffy v. Setchell,* 38 Ill.App.3d 146, 347 N.E.2d 218 (1976), suggests that even if Frey could ultimately win a suit for repudiating his contract with the Flynns, he would still probably be faced with a lawsuit by the Flynns, as was the defendant in *Duffy.*