**Debra KEACH and Patricia Sage, Plaintiff,**

v.

**U.S. TRUST COMPANY, N.A., et al., Defendants.**

No. 01–1168.

United States District Court, C.D. Illinois, Peoria Division.

Feb. 27, 2003.

Dean B. Rhoads, Robert Rhode, Edward Sutkowski, Steven Oates, Sean Anderson, Sutkowski & Rhoads Peoria, IL, for Plaintiffs.

Timothy Bertschy, Heyl, Royster, Voelker & Allen, Peoria, IL, Robert Eccles, Shannon M. Barrett, O'Melveny & Myers LLP, Washington, DC, Charles Roth, James Springer, Joseph Z. Sudow, Kavanagh, Scully, Sudow, White & Frederick, Peoria, IL, Michael T. Graham, Nancy Ross, McDermott, Will & Emery, Chicago, IL, Trent P. Cornell, Duane Morris LLC, Chicago, IL, Richard J. Pautler, Jennifer Baetje, Thompson & Coburn, St. Louis, MO, James Bailey, Paul Ondrasik, Jr., Steptoe & Johnson, Washington, DC,

Roy Davis, David Lubben, Davis & Campbell LLC, Peoria, IL Mark Casciari, Ian Hugh Morrison, Sari M. Alamuddin, Seyfarth Shaw, Chicago, IL, Stephen Gay, Jeffrey Alan Ryva, Husch & Eppenberger LLC, Jeffrey Rock, Hasselberg Rock Bell & Kuppler, Peoria, IL John Elias, Robert Riffle, Cynthia Elias, Elias Meginnes Riffle & Seghetti, Peoria, IL, Dean Essig, Washington, IL, for Defendants.

## ORDER

MIHM, District Judge.

Now before the Court is a Motion for Summary Judgment by Defendant James N. Freid ("Freid"). For the reasons set forth below, the Motion for Summary Judgment [# 419] is GRANTED IN PART and DENIED IN PART.

## FACTUAL BACKGROUND

The basic factual background has been sufficiently set forth in the prior orders of this Court, and familiarity therewith is presumed. The present motion is brought by Defendant Freid, who is in this suit only as a party-in-interest in Count IX of the First Amended Complaint. He was the Vice President of Merchandising at F & G. The matter is now fully briefed and ready for resolution. This Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable fact-finder could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995).

Freid is in this case solely as a non-fiduciary party-in-interest pursuant to § 406(a) of ERISA, which prohibits a "sale or exchange ... of any property between the plan and a party in interest," and also prohibits a "transfer to ... a party in interest ... of any assets of the plan." 29 U.S.C. § 1106(a)(1)(A) and (D). ERISA further defines a "party in interest" to include any fiduciary, person providing services to the plan, an employer, an employee/officer/director or 10% shareholder of an employer, or any relative of these

individuals. 29 U.S.C. § 1002(14). There is no dispute that Freid qualifies as a party in interest.

As the Court has previously held and hereby incorporates by reference, once Plaintiffs establish that the purchases of stock by the ESOP constituted a prohibited transaction under § 406, § 502(a)(3) then provides a right of action to seek appropriate equitable relief from parties in interest to redress the violation. *Harris Trust,* 120 S.Ct. at 2188, *citing* § 502(*l* )(1)(B). Borrowing from the law of trusts, the Defendants can then invoke the substantive equivalent of a modified bona fide purchaser defense by establishing that they gave value for the trust property. If the Defendants are able to make such a showing, a presumption of good faith attaches, and the burden shifts back to the Plaintiffs to establish that Defendants acted in bad faith or had actual or constructive notice of the circumstances that rendered the transaction unlawful.

Plaintiffs have conceded that at least for purposes of these motions, they do not contest that the stock purchase transactions were for "value" in the sense that they were not gratuitous but rather involved consideration that was more than nominal. Accordingly, Freid is entitled to a presumption of good faith and lack of knowledge unless Plaintiffs are able to rebut that presumption.

Initially, the Court notes that Plaintiffs make no effort to demonstrate actual knowledge, relying instead on a constructive knowledge or imputed theory. In this respect, Plaintiffs argue that Freid undertook no independent investigation or inquiry with respect to the transactions. However, this puts the cart before the horse, as he is not a fiduciary, and the law does not impose such an onerous duty on non-fiduciaries in the absence of notice of the need to do so. In addition to being a non-fiduciary, Freid was not a Board Member,

Executive Committee Member, or member of the ESOP Administrative Committee. He was not employed in the financial department of F & G or by MBC, and to his knowledge, business was quite good for F & G at the time of the transactions, as F & G continued to have a strong financial performance through the first two quarters of 1997. Moreover, the Court is unaware of any evidence linking Freid to the process of structuring the stock purchase transactions, determining the value of shares to be sold, or negotiating the stock purchase price. Access to certain information that was made available or known to the F & G Board or Executive Committee or other top F & G executives cannot be presumed but must be proven, and it is that proof that is lacking here.

■■■ Plaintiffs suggest that because Freid appointed Stuber to act as his agent in the 1995 stock purchase transaction, and Stuber was present when the F & G Board discussed pending investigations of MBC, had access to other information placing the value of F & G stock in question, and was aware of purported conflicts of interest on the part of Foster, Regal, and Valuemetrics, his knowledge can be imputed to Freid. While the Court agrees that a party-in-interest cannot shield himself/herself from liability by appointing an agent to receive all information in connection with a prohibited transaction, Plaintiffs fail to acknowledge the limited purpose for which the record indicates that Stuber was appointed to serve as Freid's agent. The record is simply devoid of evidence indicating that Stuber engaged in any conduct in this capacity other than the ministerial acts of attending the closing in Chicago on his behalf, signing for and taking possession of his check at the closing, and distributing the check to him. Stuber did not investigate or receive all preliminary information on behalf of Freid, serve

as his financial advisor, or determine whether he should participate in the transaction. The suggestion that Stuber's appointment one day prior to the closing solely for the ministerial act of attending and finalizing the 1995 transaction thereby vested Freid with any knowledge that Stuber obtained months or even years prior to the beginning of the agency is both readily distinguishable from the authority cited and utterly unpersuasive. *See Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir.1994), *citing Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992) (finding that knowledge of an agent is imputed to the principal only if the agent receives the knowledge while acting within the scope of his authority and when the knowledge concerns a matter within the scope of that authority); *Frey v. Fraser Yachts*, 29 F.3d 1153, 1158 (7th Cir.1994), *citing Curtis, Collins & Holbrook Co. v. United States*, 262 U.S. 215, 43 S.Ct. 570, 572, 67 L.Ed. 956 (1923); *Kuska v. Folkes*, 73 Ill.App.3d 540, 29 Ill.Dec. 399, 402, 391 N.E.2d 1082 (1979).

█ Plaintiffs otherwise attempt to demonstrate knowledge by stating that Freid was involved in the due diligence process when F & G bought MBC in 1992 and received copies of checklists indicating the types of information that F & G wanted to obtain. Freid's uncontradicted testimony, however, reveals that his involvement in the MBC due diligence was limited to reviewing MBC's merchandising catalogs and Flower of the Month catalog. They also assert that Freid received an August 4, 1992, interoffice memorandum from Lyle Dickes containing reports generated by some of the due diligence teams. Although Plaintiffs claim that this memorandum contained materials indicating that increased state regulation of sweepstakes was a concern of MBC, the Court has found one line in a 70–page document listing "[i]ncreased state regula-

tion of sweepstakes—first round winner" as one of 12 concerns of the business. The suggestion that this was sufficient to place Freid on notice of circumstances rendering the transaction unlawful is without merit.

Plaintiffs then insinuate that the difference in the due diligence performed in 1995 from the investigation that was performed with the acquisition of MBC in 1992 should have put Freid on notice of impropriety. Even assuming that he had some basis to know that the due diligence that was performed by U.S. Trust and its advisors was less than had been performed with respect to MBC in 1992, Plaintiffs' bald assertion that the scope of due diligence for the stock purchase transaction should necessarily have been of the same magnitude as the due diligence done by the company in preparation for the potential acquisition of a new corporation to be integrated into the F & G family is both nonprobative and logically unsound. Plaintiffs further argue that Freid knew or should have known that U.S. Trust and Houlihan Lokey had resolved to rely on the representations of F & G management when conducting its due diligence, citing to the engagement letter between U.S. Trust and F & G. However, Plaintiffs fail to demonstrate that he obtained or was aware of this information. At this stage in the litigation, this failure is inexcusable, as assertions without factual support in the record cannot survive summary judgment.

Plaintiffs then note that "Dependency on sweeps—possible threats" and "Governmental regulation" were listed among the topics to be discussed at a summer leadership meeting in 1993. Although Freid attended this meeting, there is no indication in the documents cited that these discussions involved anything other than presenting a possible business problem or inefficiency for which a corrective solution

was being proposed for action in the near term. There is no indication of attorney general investigations, regulatory inquiries, or anything else that would indicate that the situation was critical or exposing MBC, and therefore F & G, to imminent financial ruin, particularly as Freid would also have been aware that F & G and MBC continued to make record profits despite these possible problems.

Freid attended a Summer Leadership Meeting at the Peoria Country Club in 1995, the purpose of which was to discuss the proposed ESOP transaction. However, Plaintiffs have introduced no evidence indicating that this meeting was anything more than a general overview of the transaction plus the opportunity for shareholder participants to ask preliminary questions. Plaintiffs also point to a copy of a memorandum from Dickes dated August 25, 1995. The memorandum refers to an overview of the proposed ESOP transaction that was apparently given during the Summer Leadership Meeting and informs the recipients of the arrangements that were being made with institutional lenders, as well as the due diligence that would be performed by both the potential lenders and the valuation firms. However, even assuming that this had some probative value, Freid is not listed as a recipient of this memorandum, and there is nothing in the record suggesting that he was otherwise aware of its contents.

Plaintiffs cite to correspondence from Michael Norbutas, F & G's Treasurer, in June and July 1995 and a December 1995 tax opinion from Price Waterhouse as evidence of knowledge but fail to recognize that Freid is not an indicated recipient of any of this correspondence. On November 2, 1995, a memorandum was sent to "All Peoria Officers" announcing the closing of MMI as "[c]hanges in the stampsheet/sweepstakes business have had a very negative effect on the magazine agency business." Again, the Court finds this evidence non-probative of the requisite notice or knowledge.

On November 14, 1995, there was another meeting at the Country Club where certain officers were updated as to the details of the proposed stock purchase transaction. In is unclear from the record whether Freid was present for this meeting; however, even assuming that he was present, the testimony of others who attended that meeting indicates that what was discussed was nothing more than a general overview of the transaction plus the opportunity for shareholder participants to obtain information regarding their personal participation in the transaction. There is no indication that any of the discussion would have reasonably put Freid on notice that inadequate due diligence was being conducted or that material information was being withheld from the trustee and its advisors.

Freid received a copy of a Confidential Disclosure Memorandum dated November 10, 1995, which contained the general structure of the proposed ESOP transaction, as well as information particular to his individual participation. On pages 15–16 of their response brief, Plaintiffs cite portions of the Disclosure Memorandum which actually cut in favor of Freid, as they put him on notice that as the ESOP Trustee, U.S. Trust had certain obligations: it must comply with ERISA; it might be required to override company instructions if fiduciary issues arise; it must demonstrate its loyalty to the interests of the ESOP beneficiaries; and it must exercise appropriate prudence and diligence. The Disclosure Memorandum also represented that the price was the result of arms-length negotiations and that certain factors that could affect the post-transaction value of the shares had been considered in some fashion. At best, the

document put Freid on notice of the fact that book value restrictions were being removed and vesting of shares was being accelerated for the transaction. While this information may have put him on notice that he was getting a good deal, it would not cause a reasonable person in his position to infer that something sinister or improper was afoot.

Plaintiffs then point to the representations made by all of the selling shareholders in the Agreements to Purchase Stock. Specifically, they cite paragraph 3.B. of the Recitals section, which acknowledges that each seller has received a copy of and is familiar with the Disclosure Memorandum with its exhibits and enclosures, including the Private Placement Memorandum from BA Securities, Inc., F & G's audited financial statements, and Valuemetrics' Transaction Memorandum. Freid also received a confidential memorandum from Regal dated November 29, 1995. In this memorandum, Regal notes a decline in the market value of most publicly traded direct marketing companies and then goes on to state that this fact "greatly influenced the decision process of the ESOP Trustee, U.S. Trust Company, it's financial advisor, Houlihan Lokey Howard & Zukin and ourselves in reaching an agreement on a price for the stock that we would sell to the ESOP." This would have been completely consistent with their knowledge that the purchase price for the 1995 transaction had been negotiated down from $24.00 per share to $19.50 per share.

On December 7, 1995, Valuemetrics issued a Confidential Transaction Memorandum that was distributed to each of these Defendants, providing them with a detailed explanation of the mechanics of the stock purchase transaction. Plaintiffs assert that Freid was similarly informed as to the pertinent details of the 1997 stock purchase transaction.

With all due respect, the information discussed in the preceding paragraphs, even when considered cumulatively with all inferences *reasonably* drawn therefrom, does not establish constructive knowledge of a breach of trust. Freid has also submitted a sworn affidavit attesting to the fact that he: (1) had no involvement with MBC's strategic plans or financial projections; (2) never saw the F & G Board books that contained information regarding the consumer complaints and sweepstakes issues until they were produced in discovery in this case; (3) was not involved in the decisions of the F & G Board, Executive Committee, or any other committee involved in that transaction; (4) was not aware of any significant issue or concern relating to sweepstakes issues until several years after the 1995 transaction; and (5) was not involved in structuring the ESOP transactions or determining, negotiating, or establishing the price per share. However, Plaintiffs have introduced additional evidence specific to Freid that, when construed in the light most favorable to Plaintiffs, could rebut some of his assertions, as it calls into question both the state of his knowledge and the reasonableness of his reliance on the professionals who structured/approved the transactions.

Specifically, Plaintiffs cite to a July 25, 2001, email to Plaintiffs' counsel from Fried in which he is transmitting pages from the November 10, 1995, Confidential Disclosure Memorandum. The email states in relevant part:

After the cover letter from Tom on November 10, 1995 we have the introduction to the basics of the offering which outline the "RISK FACTORS" stated on page 6. Notice the deletion of the obvious. The threat of "sweeps" legislation. This was also not brought up at the dinner meeting on November 14, which also included a question & answer period. Any business disclaimers later on in

the plan are pure hogwash as the "planning data" that I have provided you always listed the "sweeps" legislation as a definite threat prior to & after the acquisition. Why hide it from the ESOP II offering? Do you have any guesses? Advise if you would like the entire book. Hope this brings my point further home to you.

Fried's statements are susceptible to more than one reasonable interpretation. On the one hand, he may have had these revelations only in retrospect once everything went south, and he was trying to obtain favorable treatment in this lawsuit. On the other hand, the tone of his comments could suggest an awareness of circumstances *at the time of the transaction* from which he should have known that the transaction was at least potentially unlawful. Plaintiffs have also presented evidence from which Freid's awareness of problems at MBC could possibly be inferred, namely a manuscript on the history of mail order marketing that he wrote in late 1997 or early 1998; this manuscript contains Freid's opinions as to the unethical nature of MBC's marketing practices and the deceptions involved in mail order sweepstakes. While the Court does not find this particular piece of evidence to be nearly as probative as Plaintiffs seem to think it is, it does form part of the picture in which what Freid knew (and when) or should have known is presently unclear. As the issue of Fried's knowledge involves questions of credibility that cannot be resolved prior to trial, Plaintiffs have met their burden of presenting a genuine issue of material fact on the question of Freid's constructive knowledge of impropriety sufficient to survive summary judgment.

■ That being said, it is undisputed that the 1997 stock purchase was funded by a gift of funds to the ESOP for the specific purpose of purchasing the additional shares of F & G stock and that the gift would not have been made for any other purpose. Thus, the 1997 transaction was a no lose proposition for the ESOP, as it allowed the ESOP to increase its majority ownership without incurring any additional debt. As Freid had a put right entitling him to sell his shares to F & G for the same price that he received via the purchase by the ESOP, he received precisely what he would have received if he had sold his shares to F & G as originally contemplated, and there is by definition no unjust enrichment. Plaintiffs make no effort to respond to this argument or to refute the factual assertions upon which it is premised. As the constructive trust remedy sought by Plaintiffs is dependent upon proof of unjust enrichment, the Court finds that Plaintiffs are not entitled to the equitable relief sought with respect to the 1997 transaction as a matter of law, and Freid is entitled to summary judgment on this aspect of Count IX.

With respect to the 1995 transaction, the Court now finds that when the record is construed in the light most favorable to the Plaintiffs, they have presented specific facts showing that there is a genuine issue of material fact requiring resolution at trial. As no reasonable fact-finder could return a verdict in favor of Plaintiffs against Freid with respect to the 1997 transaction, he is entitled to judgment as a matter of law on that portion of Count IX.

## CONCLUSION

For the reasons set forth above, Defendant Freid's Motion for Summary Judgment [# 419] is GRANTED IN PART and DENIED IN PART.