MEMORANDUM-DECISION AND ORDER
 

 MUNSON, Senior District Judge.
 

 Now comes plaintiff Capital District Physician’s Health Plan (“CDPHP”) and defendant Michael O’Higgins (“O’Higgins”) with cross-motions for summary judgment in a dispute involving a failed investment. Oral argument was heard at this court’s motion term in Albany on October 31,1995. What follows constitutes the court’s memorandum-decision and order in this matter.
 

 I. BACKGROUND
 

 This case arises out of an investment management agreement between CDPHP and Michael O’Higgins. Plaintiff CDPHP is a health maintenance organization in the Albany area. Defendant O’Higgins is an investment adviser operating his own investment management company.
 

 When CDPHP first began accumulating fund surpluses, it invested the excess reserves according to decisions made by members of its own staff. Collins Dep., Doc. 68, at 9. It invested primarily in short term (1-3 month), highly liquid investments in order to keep funds readily accessible for payment of claims.
 
 Id.
 
 at 11. In 1989, however, in the midst of falling interest rates, CDPHP’s Finance Committee (“the Committee”) discussed hiring an outside investment manager in order to maximize income while still secur
 
 *996
 
 ing capital.
 
 Id.
 
 at 16. After a preliminary search, the Committee selected three firms to give presentations.
 
 Id.
 
 at 19. Michael O’Higgins & Co. was one of the three firms. In his presentation, he let the Committee know that his investment style could often be described as contrarian; he would invest in securities based on assumptions that went against the prevailing conventional wisdom.
 
 Id.
 
 at 24-26. The Committee asked O’Higgins to prepare another model portfolio because of the riskiness of some of the investments in the first presentation. As a result, he presented a more conservative portfolio and was selected to receive half of CDPHP’s long term surplus funds for investment.
 
 Id.
 
 at 39, 81-82. An Investment Management Agreement was signed by the parties on April 19, 1990. Am.Compl., Doc. 29, ¶ 10.
 

 Soon thereafter, in October of 1990, the Committee sent O’Higgins a letter concerning a 30-year bond he had purchased. The bond was not in accordance with the Investment Policy promulgated by CDPHP in 1988. CDPHP Fin.Comm.Mins. (“FCM”), Oct. 19, 1990, at 5. The policy, in pertinent part, required investments (1) to have maturities of at most 10 years, (2) to be a fixed income security, and (3) to fall within one of seven types of securities (the only applicable category for the present action being “debt instruments of federal government agencies”). Ex. A att’d to Am.Compl., Doc. 29. O’Higgins was told that his definition of maturity did not comply with that of CDPHP and its investment policy and was instructed to divest CDPHP of the bond as soon as it became advantageous to do so. FCM, Oct. 19, 1990, at 5.
 

 On January 26, 1993, O’Higgins purchased approximately $5.1 million in Planned Amortization Certificates-Interest Only (“PAC-IO”). Michael O’Higgins Dep., Doc. 67, at 127. PACs consist of a group of federally insured mortgages that are pooled together and then divided into different bonds that pay varying ratios of principal and interest. Interest-only PACs yield nearly all of their return (98% in this case) through interest payments. As a result, if mortgage holders decide to refinance (due to falling interest rates, for instance), the security stands to lose a substantial portion of its value. The market for the security is made by investment managers who trade them based on their assessments of the prepayment attrition rate forecasted by investment banks. The PAC-IOs are then bought and sold over the counter pursuant to individual price negotiations between dealers.
 

 In defending his choice of that investment, O’Higgins explained that
 

 I wanted to take a position against the bond market where I would profit from a decline in the bond market____ I mean that if the bond market declined in value, in other words, if interest rates rose, that I would make money, or my client would.
 

 Id.
 
 at 127-28.
 

 At the time, the prevailing consensus among most investors was that interest rates would remain stable or continue to decrease. As it turns out, interest rates did continue to fall. The investment’s value declined to $4.1 million on February 2, 1993 and $3.8 million on March 18. FCM, Mar. 19,1993, at 4.
 

 CDPHP asked O’Higgins to appear before the Committee at its March 19, 1993 meeting. At that meeting, O’Higgins defended the selection of the PAC-IO investment and also outlined the possible future of the investment. If interest rates stayed low or continued to drop, even more money would be lost; if interest rates rose, interest income would resume and CDPHP could sell the security for a profit; and if market value did not return, interest payments still would continue. O’Higgins considered the first and last predictions unlikely. FCM, Mar. 19 1993, at 4. In answer to O’Higgins statement that he was considering buying more of the PAC-IOs, Diane Bergman, Director of CDPHP, told O’Higgins not to purchase any more of the security until the Committee determined that it was a legal investment for an HMO under New York insurance laws.
 
 Id.;
 
 Collins Dep., Doe. 68, at 58.
 

 Later that evening, O’Higgins told Tom Collins, a member of the Finance Committee, that he would be resigning, and he did so officially on March 31, 1993.
 
 Id.
 
 at 59-60. After hiring First Albany Corporation to take over O’Higgins’ CDPHP portfolio, one
 
 *997
 
 half of the PAC-IO was sold August 4 at a loss of $1.3 million and the other half was sold on September 1 at a loss of $1.1 million. Am.Compl., Doc. 29 ¶¶ 58-59. Suit was commenced on January 18,1994.
 

 Cross-motions for summary judgment have been made on the first and fourth causes of actions, those being the breach of contract and section 10(b)/rule 10b-5 claims, respectively. Defendant O’Higgins has moved for summary judgment on the seventh, eighth, and tenth causes of action,
 
 viz.
 
 the control person liability, vicarious liability, and negligence claims. Defendant David Oberting, O’Higgins employee and codefendant, has moved for summary judgment on the third and fifth causes of action, the breach of fiduciary duty and section 10(b)/rule 10b-5 violations claims, respectively. In addition, plaintiff has moved for summary judgment on the second and ninth causes of action, i.e. those for breach of fiduciary duty and for Investment Adviser Act violations, respectively. The court is now prepared to rule on these motions.
 

 II. DISCUSSION
 

 A Standards
 

 The standards for granting summary judgment pursuant to Fed.R.Civ.P. 56 are governed by a familiar triumvirate of 1986 Supreme Court cases. The movant bears the initial burden of persuading the court that the record demonstrates “the absence of a genuine issue of material fact.”
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Genuine issues exist if “there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Once a movant has carried her initial burden, the respondent “must do something more than simply show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita Elec. Indus. Co. v. Zenith Radio,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion, the court must view the facts in the light most sympathetic to the nonmovant.
 
 Matsushita,
 
 475 U.S. at 587, 106 S.Ct. at 1356 (quotation omitted). The district judge’s inquiry is whether a triable issue exists with respect to the claim being moved upon — that is, whether there is enough of a material dispute over key facts that the finder of fact could reasonably decide either way.
 
 See Anderson,
 
 477 U.S. at 250, 106 S.Ct. at 2511.
 

 Analysis commences below, beginning with CDPHP’s theory under the Investment Advisers Act.
 

 B. Rescission of Contract for Violation of Brochure Rule
 

 The court first turns to a discussion of plaintiff’s motion for summary judgment upon its ninth cause of action.
 
 See
 
 Am. Compl., Doc. 29, ¶ 115-18. Plaintiff argues that it is entitled to rescission of the investment advisory contract and the return of fees paid to defendant O’Higgins because he failed to comply with certain rules promulgated by the Securities and Exchange Commission pursuant to its authority under the Investment Advisers Act of 1940. Pl.’s Mem. Law, Doe. 62, at 46-49.
 

 The Investment Advisers Act, ch. 686, tit. II, 54 Stat. 847 (codified as amended at 15 U.S.C. § 80b-l et seq.) regulates that profession, imposing registration and disclosure requirements upon advisers, and empowering the SEC to sanction those who violate the Act’s provisions.
 
 See generally
 
 2 Thomas Lee Hazen, The Law of Securities Regulation ch. 18 (2d ed.1986). To help effectuate and clarify the Act, the SEC is expressly tasked to develop rules to supplement it.
 
 See, e.g.,
 
 15 U.S.C. §§ 80b-3, 80b-6(4), & 80b-ll. The SEC’s authority to enforce these rules is concomitant with its authority to police the Act’s statutory requirements.
 
 Id.
 
 § 80b-9.
 

 Plaintiff alleges defendant has failed to comply with one such regulation known as the “brochure rule.” 17 C.F.R. § 275.204-3. The brochure rule requires an investment adviser to “furnish each advisory client and prospective advisory client with a written disclosure statement which may be either a copy of Part II of its form ADV ... or a written document” supplying information
 
 *998
 
 identical to that form.
 
 Id.
 
 § 275.204r-3(a). Form ADV is the initial registration document for investment advisers that must be filed with the SEC.
 
 Id.
 
 § 275.203-1. Furthermore, “[a]n investment adviser ... annually shall, without charge, deliver or offer in writing to deliver upon written request to each of its advisory clients” the required information.
 
 Id.
 
 § 275.204r-3(c).
 

 Section 215 of the session law version of the Act, entitled “Validity of Contracts,” provides the only remedy available to private plaintiffs. In relevant part, this “voidability” section reads
 

 (b) Every contract made in violation of any provision of this subehapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subehapter,
 
 or any rule, regulation,
 
 or order thereunder, shall be void____
 

 15 U.S.C. § 80b-15(b) (italics added).
 

 The Supreme Court has held that section 215 authorizes “a suit for rescission or for an injunction against continued operation of the contract, and for restitution.”
 
 Transamerica Mortgage Advisors, Inc. v. Lewis,
 
 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979) (footnote omitted).
 

 No material fact is in dispute with regards to this issue. Defendant concedes that he failed to comply with the brochure rule, in that he did not provide or offer in writing to provide plaintiff with the required information on an annual basis. Michael O’Higgins Dep., Doc. 67, at 194-95. Defendant instead contends that (1) plaintiffs summary judgment motion concerning this omission seeks relief on a claim not set forth in the amended complaint, and (2) that the statute of limitations has run. Defs.’ Mem.Law. in Opp’n, Doc. 64, at 37-41. The court examines these defenses below.
 

 1. Sufficiency of Amended Complaint
 

 Under Fed.R.Civ.P. 8(a) a claim for relief in a complaint, besides alleging grounds for federal jurisdiction, need only set forth “a short and plain statement of the claim showing that the pleader is entitled to relief’ and “a demand for judgment for the relief the pleader seeks.” Rule 8(e)(1) further instructs the pleader to make his averments “simple, concise, and direct.” The Federal Rules of Civil Procedure abandon the arcane and ancient distinctions that encumbered former pleading practice in favor of “notice pleading.”
 
 See Conley v. Gibson,
 
 355 U.S. 41, 47-48, 78 S.Ct. 99, 102-03, 2 L.Ed.2d 80 (1957). This theory is liberal to the pleader. A complaint need not state “facts,” “ultimate facts,” or even “facts sufficient to constitute a cause of action.”
 
 Wade v. Johnson Controls, Inc.,
 
 693 F.2d 19, 21 (2d Cir.1982) (citing 2A James Wm. Moore, Moore’s Federal Practice ¶ 8.13 (2d ed.1995)). All that is required is that a defendant receive fair notice of the nature of the claim and the grounds upon which it rests.
 
 Conley,
 
 355 U.S. at 47, 78 S.Ct. at 103.
 

 Turning to the complaint in this matter, the relevant paragraphs are
 

 48. The O’Higgins firm failed to provide Securities and Exchange Commission Form ADV, Part II, to CDPHP and failed to disclose the information contained therein.
 

 AS AND FOR A NINTH CAUSE OF ACTION
 

 Investment Advisors Act
 

 115. Plaintiff repeats and realleges paragraphs 1 through 114 as if set forth here in full.
 

 116. The O’Higgins firm is an investment advisor within the meaning of 15 U.S.C. § 80b-2(ll).
 

 117. The acts of the O’Higgins firm set forth violated 15 U.S.C. § 80b-6.
 

 118. CDPHP is entitled to rescission of the investment management agreement to return of the fees paid thereunder, in the amount of $142,506.96.
 

 Am.Compl., Doc. 29.
 

 O’Higgins’ argument is based on the reference in paragraph 117 to 15 U.S.C. § 80b-6 (section 206 of the session law), the antifraud provision of the Investment Advisers Act. Defendant maintains that the reference
 
 *999
 
 should have been to 15 U.S.C. § 80b-4, “Reports by investment advisers.” This alleged mislabeling, it is argued, failed to give notice to defendant of what kind of claim was being made.
 

 Defendant’s construction is inconsistent with the Federal Rules’ theory of pleading. Paragraphs 48 and 116 of the amended complaint sufficiently comprise a factual predicate for a claim for relief. Paragraph 116 avers that defendant is subject to the requirements of the Investment Advisers Act. One of the requirements is the brochure rule. Paragraph 48 alleges that defendant failed to comply with this rule. Paragraph 117 characterizes this omission as a breach of the Act’s antifraud provision.
 

 Defendant assumes that the brochure rule was promulgated pursuant to 15 U.S.C. § 80b-4. That statute obligates those advisers subject to the Act’s strictures to “make and disseminate such reports as the Commission,
 
 by rule,
 
 may prescribe as necessary or appropriate.” (italics added) But the anti-fraud section bestows rulemaking authority as well:
 

 The commission shall, for the purposes of this paragraph (4)
 
 by rules and regulations
 
 define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.
 

 15 U.S.C. § 80b-6(4) (italics added).
 

 Defendants “are unaware of any ease law ... which holds that a violation of 15 USC § 80b-4 constitutes a violation of 15 USC § 80b-6.” Defs.’ Mem.Law in Opp’n, Doc. 64, at 37. More properly the question is whether noncompliance with the brochure rule can constitute a breach of § 80b-6, the antifraud provision. It is evident the SEC believed it could be: at the foot of the text of the brochure rule, the Commission cited
 
 both
 
 session law sections 204 (§ 80b-4) and 206 (§ 80b-6(4)) for statutory authority underpinning the regulation.
 
 See
 
 17 C.F.R. § 275.204-3. And the Supreme Court has affirmed generally that simple nondisclosure under the Investment Advisers Act can constitute a fraudulent or deceitful practice.
 
 See SEC v. Capital Gains Research Bureau,
 
 375 U.S. 180, 198-99, 84 S.Ct. 275, 286-87, 11 L.Ed.2d 237 (1963).
 

 Of course, there is no private action under the antifraud provision of the Act.
 
 Transamerica,
 
 444 U.S. at 19-24, 100 S.Ct. at 246-49. But paragraph 118 of the amended complaint indicates this is not the relief plaintiffs seek. The remedies of rescission of contract and return of fees and other consideration are available under section 215, 15 U.S.C. § 80b-15, quoted in pertinent part above.
 
 Id.
 
 at 18-19, 100 S.Ct. at 246-47. The claim is reducible to a syllogism: (1) section 215 permits a plaintiff to void an investment advisory contract, the performance of which involves the violation of the Act or rules promulgated thereunder; (2) defendant herein ignored the brochure rule, violating inter alia the antifraud provision; therefore (3) plaintiff in this case may void the contract and sue for restitution of fees.
 
 Cf Laird v. Integrated Resources, Inc.,
 
 897 F.2d 826, 839 (5th Cir.1990) (plaintiff made out sufficient fraud claim under Investment Advisers Act; district court should have granted rescission even though plaintiff did not demand such relief).
 

 Indeed, reading the voidability provision fairly, plaintiffs right to rescind the contract does not turn on whether the brochure rule was issued under the color of section 204 or 206. The fact that plaintiff engaged in an ongoing violation of the brochure rule is sufficient in and of itself. We now proceed to the limitations defense.
 

 2. Statute of Limitations
 

 The limitations period for a cause of action arising under the Investment Advisers Act is one year from the discovery of the wrong, not to exceed three years from commitment of the wrong.
 
 Kahn v. Kohlberg, Kravis, Roberts & Co.,
 
 970 F.2d 1030, 1042 (2d Cir.),
 
 cert. denied,
 
 506 U.S. 986, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992). Discovery includes not merely actual notice,- but constructive or inquiry notice as well.
 
 Menowitz v. Brown,
 
 991 F.2d 36, 41 (2d Cir.1993). The test is an objective one.
 
 Siebert v. Nives,
 
 871 F.Supp. 110, 114 (D.Conn.1994). A plaintiff will be deemed to have discovered the violation when he or she “obtains actual
 
 *1000
 
 knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.” Kahn, 970 F.2d at 1042 (citation omitted). A plaintiff is on inquiry notice for securities litigation limitation purposes when “storm warnings” appear that would arouse the suspicion of the reasonably prudent investor.
 
 E.g., Siebert,
 
 871 F.Supp. at 114;
 
 In re Integrated Resources, Inc.,
 
 851 F.Supp. 556, 567 (S.D.N.Y.1994);
 
 see Dodds v. Cigna Secs., Inc.,
 
 12 F.3d 346, 350 (2d Cir.1993),
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 1401, 128 L. Ed.2d 74 (1994).
 

 The relevant dates are not in dispute. Defendant entered into the investment advisory contract with plaintiff on April 19,1990. The brochure rule requires that the required disclosure be made prior to or at the entry of the investment advisory contract, and annually thereafter. 17 C.F.R. § 275.204-3(b) & (c). The first complaint was filed January 18, 1994.
 
 [1]
 
 O’Higgins resigned on March 31, 1993.
 
 See
 
 Defs.’ Mem.Law in Opp’n, Doc. 64, at 40; FCM, May 21,1993, at 3.
 

 As an initial matter, it appears clear that no relief may be granted for any wrongs occurring prior to January 18, 1991. Plaintiff has not alleged that any equitable considerations justify tolling the three-year maximum limitations periods,
 
 e.g. Dodds,
 
 12 F.3d at 352-53, thus the court is bound to apply it. Defendant, however, maintains that his failure to tender the disclosure prescribed by the brochure rule on each occasion he was required to do so constituted notice sufficient to trip the limitations clock. Defs.’ Mem. Law In Opp’n, Doc. 64, at 38. If defendant’s argument is accepted, plaintiff will be limited to relief for wrongs occurring on January 18, 1993 and thereafter.
 

 Defendant contends that two facts put plaintiff on constructive or inquiry notice of defendant’s noncompliance with the brochure rule: the very omission itself, and that plaintiffs other adviser, Smith Barney, did comply with the rule.
 
 Id.
 
 at 38-39. Because the court believes the former circumstance constituted notice sufficient to start the limitations period, it does not address the latter argument.
 

 The omission was the fact giving rise to the claim. That plaintiff may not have known at the time that the omission had a legal remedy is of no consequence. Knowledge of the law is presumed and plaintiffs are tasked to exercise reasonable diligence in determining whether or not particular acts or omissions causing injury are actionable in court.
 
 See Keystone Ins. Co. v. Houghton,
 
 863 F.2d 1125, 1127 (3d Cir.1988);
 
 Lee v. United States,
 
 809 F.2d 1406, 1410 (9th Cir. 1987),
 
 cert. denied sub nom. Lee v. Eklutna, Inc.,
 
 484 U.S. 1041, 108 S.Ct. 772, 98 L.Ed.2d 859 (1988). The limitations period runs from plaintiffs actual or constructive discovery of the injury, not when he or she first learns that a legal cause of action is available.
 
 Jensen v. Snellings,
 
 636 F.Supp. 1305, 1311 (E.D.La.1986),
 
 affd in part, rev’d in part on other grounds,
 
 841 F.2d 600 (5th Cir.1988). Similarly, ignorance that the law provides a remedy for a discovered injury cannot be the grounds for equitable tolling.
 
 Jones v. General Motors Corp.,
 
 939 F.2d 380, 385 (6th Cir.1991).
 

 Admittedly, the rule seems unduly harsh when applied to circumstances such as these. An omission does not raise a red flag if the victim of the wrong is unaware of the tortfeasor’s legal obligation. In this case, that obligation was a relatively obscure one imposed by the Code of Federal Regulations. However,
 
 Kahn v. KKR
 
 disposes of this line of argument. In that case, plaintiffs sought rescission of an investment advisory contract based upon the defendant’s failure to register pursuant to the Investment Advisers Act. 970 F.2d at 1032. The Second Circuit ruled that constructive discovery of the facts sufficient to start the clock occurred when defendant’s
 

 intention not to register under the IAA was made public by a No-Action letter to the SEC reported in an official reporter in
 
 *1001
 
 1985 and by the fact that such public registration was absent from the public records.
 

 Id.
 
 at 1042.
 

 Comparing
 
 Kahn
 
 to the instant matter, it is difficult to argue that a plaintiff can be charged with knowledge of the publication of SEC no-action letters in the Federal Register, but not with the publication of SEC rules in the Code of Federal Regulations. Defendant’s overt failure to discharge his duty under the brochure rule was the fact giving rise to the claim, and serves as the event tripping the limitations clock.
 

 The
 
 Kahn
 
 case also stands for the proposition that the “continuing wrong” theory does not apply in an action for rescission based upon an investment adviser’s failure to comply with the Act.
 
 See id.
 
 at 1039-42. The
 
 Kahn
 
 panel rejected the argument that each time the defendant in that case acted as an investment adviser, a new wrong based on defendant’s failure to register accrued to plaintiff.
 
 Id.
 
 at 1041. This court similarly rules that defendant’s failure to tender the required information in this ease did not transform each subsequent act performed in an investment advisory capacity into a separate wrong, triggering the prescription period anew.
 

 Because plaintiff discovered the facts underlying an action for rescission when defendant failed to comply with the brochure rule as published in the C.F.R, they may only obtain relief for wrongs occurring at most one year prior to filing the original complaint on January 18, 1994. It transpires though that defendant did not violate the brochure rule between January 18, 1993 and January 18, 1994; he resigned as investment adviser for plaintiff before April 19, 1993, the anniversary of the advisory contract.
 
 See
 
 Defs.’ Mem.Law in Opp’n, Doc. 64, at 40; FCM, May 21,1993, at 3.
 

 The statute of limitations for all violations of the brochure rule in this matter has expired. Plaintiffs motion for summary judgment on the ninth cause of action in its amended complaint is therefore DENIED.
 

 C. Summary Judgment for Breach of Fiduciary Duty
 

 CDPHP also moves for summary judgment based upon an alleged breach of fiduciary duty by defendant Michael O’Higgins’, the plaintiffs second cause of action. Am. Compl., Doc. 29, ¶¶ 62-68. In addressing this issue, the court must establish (1) whether a fiduciary relationship was present, (2) whether that relationship entails a duty of disclosure, (3) whether O’Higgins’ nondisclosure was material, and (4) what type of causation is necessary to support the award of damages.
 

 1. Presence of a Fiduciary Relationship
 

 Before reaching the issue of whether O’Higgins breached his fiduciary duty to CDPHP, the court must establish whether there was in fact a duty owed. Agent and principal,
 
 see, e.g., Opper v. Hancock Securities Corp.,
 
 250 F.Supp. 668 (S.D.N.Y.),
 
 affd,
 
 367 F.2d 157 (2d Cir.1966), trustee and trust,
 
 see, e.g., Diduck v. Kaszycki & Sons Contractors, Inc.,
 
 974 F.2d 270, 275 (2d Cir.1992), and attorney and client,
 
 see, e.g., Milbank, Tweed, Hadley & McCloy v. Boon,
 
 13 F.3d 537 (2d Cir.1994) are all relationships that impose the duty of the highest ethical standards on the professional.
 

 The Supreme Court wrote that, in the wake of the stock market crash of 1929, Congress had recognized “the delicate fiduciary nature of an investment advisory relationship” and the need to eliminate conflicts of interest that could lead to faulty investment advice.
 
 SEC v. Capital Gains Research Bureau,
 
 375 U.S. 180, 191, 84 S.Ct. 275, 282-83, 11 L.Ed.2d 237 (1963). The Court did not question the congressional finding that the investment adviser was a fiduciary; in fact, the Investment Advisers Act reflected the court-imposed duty of “utmost good faith, and full and fair disclosure of all material facts.”
 
 Id.
 
 at 194, 84 S.Ct. at 284 (citation omitted). More recent cases that discuss fiduciary breaches in the investment adviser-client context assume that the fiduciary relationship exists.
 
 See, e.g., Miltland Raleigh-Durham v. Myers,
 
 807 F.Supp. 1025 (S.D.N.Y.1992);
 
 Folger Adam v. PMI Industries,
 
 938 F.2d 1529 (2d Cir.),
 
 cert. de
 
 
 *1002
 

 nied,
 
 502 U.S. 983, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991);
 
 Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,
 
 731 F.2d 112 (2d Cir.1984).
 

 In deciding a case based upon New York agency law, the Southern District held that when an investment firm sold 6000 of its own shares of a stock for $19.50 while at the same time selling 3000 client-owned shares of the same stock for $19.00, it “became liable on bedrock principals that defendant does not presume to question frontally.”
 
 Opper,
 
 250 F.Supp. at 673. The court ruled that there had been a breach of faith, and that the duties of a fiduciary with respect to an investor were if anything more strict than the duty New York agency law required of other agents.
 
 Id.
 
 at 676.
 

 CDPHP’s complaint and Michael O’Higgins’ answer agree that the two parties “entered into an ‘Investment Management Agreement’ ” on April 19, 1990. Am.Compl., Doc. 29, ¶ 9; Defs.’ Answer, Doc. 30, ¶ 4. There is also agreement that O’Higgins “is in the business of providing investment management services to his clients, including advising clients as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.” Am.Compl., Doc. 29, ¶ 6; Defs.’ Answer, Doe. 30, ¶ 4. It is not disputed “that defendant Michael O’Higgins did invest funds of the plaintiff in the PAC-IO securities.” Defs.’ Answer, Doc. 30, ¶ 1. The two parties thus acknowledge the existence of one of the relationships that establishes a fiduciary duty on O’Higgins’ part, that of investment adviser and client. During the defendant’s deposition, while claiming that he had fulfilled his obligation to get a good price for the security at issue, O’Higgins acknowledged that “I’m bound to try to buy securities reasonably for my clients.” Michael O’Higgins Dep., Doc. 67, at 391. O’Higgins owed a duty of good faith dealing to CDPHP and knew this duty existed.
 

 As a defense, O’Higgins attempts to distinguish his relationship with CDPHP from typical fiduciary relationships. He argues that because CDPHP’s account was discretionary, he had no duty to inform CDPHP of any investment decisions he made before acting upon them. O’Higgins RepLMem. Law, Doc. 56, at 14. It is argued that the discretionary nature of the account gave him free rein to act as he wished. The Eastern District of Michigan spoke to the issue of discretionary versus nondiscretionary accounts.
 
 Leib v. Merrill Lynch, Pierce, Fenner & Smith,
 
 461 F.Supp. 951 (1978),
 
 ajfd,
 
 647 F.2d 165 (6th Cir.1981). In a nondiscretionary account, the customer chooses specific purchases and sales and the investment adviser merely gives effect to those decisions. As a result, any duty ceases when a transaction is complete; the adviser does not, for instance, have to keep abreast of financial information concerning the investment.
 
 Id.
 
 at 953.
 

 In a discretionary account, on the other hand, the broker or investment adviser is a fiduciary.
 
 Id.
 
 It is true that the investment adviser does not need prior authorization to make an investment, but the court pointed to four duties that exist specifically in relation to discretionary accounts: (1) to manage the account as the customer stated in authorization papers, (2) to keep informed of market changes, (3) to inform the customers of transactions, and (4) to explain the consequences and risks of any course of dealing in which the adviser engages.
 
 Id.
 
 The third responsibility refutes O’Higgins’ argument about not needing to disclose his trades, but it is the final duty that has even greater relevance. O’Higgins’ investment of a large portion of CDPHP’s money through his brother is a course of dealing that is neither typical nor to be expected and that did lead to unusual consequences and risks. Since O’Higgins was required to act in the best interests of his client, there was even more reason to disclose a conflict the client could not know about — before the investment was made or at the very least at the meeting when that specific investment was under scrutiny.
 

 Finally, O’Higgins acknowledges the presence of a fiduciary duty in refuting one of the federal securities law causes of action. “Mr. O’Higgins was still subject to a fiduciary duty of due care, similar to the defendant in
 
 O’Brien.”
 
 O’Higgins Repl.Mem.Law, Doc. 56, at 13 (citation omitted). For these rea
 
 *1003
 
 sons, the court holds that O’Higgins owed a fiduciary duty to CDPHP.
 

 2. The Duty To Disclose Conflicts Of Interest
 

 The Supreme Court, in
 
 Chiarella v. United States,
 
 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), explained what duties a fiduciary relationship entails. In that case, the Court was applying federal securities law to determine whether a printer trading on inside information about a takeover bid had breached his duty to the plaintiff shareholders. It held that a duty to disclose existed under federal law, but only when the other party was entitled to know that information on the basis of a fiduciary relationship of trust and confidence.
 
 Id.
 
 at 228, 100 S.Ct. at 1114.
 

 The Second Circuit found a duty to disclose conflicts of interest and other material information in applying New York law to a breach of fiduciary duty claim. The test was nearly identical to that used by the Supreme Court. “Omissions of material fact may rise to a level constituting fraud and serve as a basis for an action for money damages.”
 
 Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,
 
 731 F.2d 112, 123 (2d Cir.1984). But before that action can lie there must first be a duty of disclosure. That duty to disclose arises if there is a fiduciary relationship established by statute or case law, or if one party possesses superi- or knowledge, not readily available to the other and knows the other is acting on mistaken information.
 
 Id.
 

 In
 
 Miltland v. Myers
 
 one of the defendant agents had a 25% equity stake in a parcel of land that he was selling. 807 F.Supp. 1025, 1034-35 (S.D.N.Y.1992). The agent’s nondisclosure of the possibly adverse interest constituted a breach of fiduciary duty to the principal.
 
 Id.
 
 at 1060. O’Higgins’ relationship with his brother is analogous to the 25% equity interest. Although one cannot say decisively that the equity interest or the family relationship led to a fraud or a poor investment, a duty of disclosure exists so that the principal can decide for himself whether the investment adviser can overcome the adverse interest and live up to the duty of acting in the principal’s best interests. The fiduciary’s assurances that he can maintain his total objectivity are not enough, even if the court has faith in the fiduciary’s character.
 
 See SCA Servs. v. Morgan,
 
 557 F.2d 110, 117 (7th Cir.1977).
 

 In the setting of an attorney-client relationship, the New York Court of Appeals set the ground rules for fiduciaries.
 
 In re Bond
 
 &
 
 Mortgage Guarantee Co.,
 
 303 N.Y. 423, 103 N.E.2d 721 (1952). If there is a possibility of a conflict, it is the fiduciary’s duty to make a complete disclosure or else stay away from the situation before it becomes a conflict. 303 N.Y. at 431, 103 N.E.2d 721.
 

 Other states have imposed different standards in requiring a fiduciary to disclose conflicts. Georgia statutes create a duty of disclosure that can be inferred once an agency relationship is established.
 
 McLendon v. Georgia Kaolin Co.,
 
 837 F.Supp. 1231, 1240 (M.D.Ga.1993) (citation omitted). The Seventh Circuit has held that there exists a duty to disclose even if the plaintiff should have known or could have found out the undisclosed information.
 
 Frey v. Fraser Yachts,
 
 29 F.3d 1153 (7th Cir.1994). In the last-mentioned case, the plaintiff did not have actual knowledge of the conflict of interest (even though the information was available), and even if he did, the defendant had not revealed all the material information.
 
 Id.
 
 at 1157. Consequently, the defendant was liable for receiving commissions from both seller and buyer in a yacht sale. The court cited the Florida Supreme Court in requiring disclosure of all information that bears on the desirability of the transaction.
 
 Id.
 
 at 1156-57 (citation omitted).
 
 [2]
 

 
 *1004
 
 Liability also arose when a broker owned an interest in securities he sold to customers and withheld that fact when recommending the security to a buyer and counseling against selling that particular security to cover a margin call.
 
 Prawer v. Dean Witter Reynolds, Inc.,
 
 626 F.Supp. 642 (D.Mass. 1985). In deciding the case based on Massachusetts common law, the District of Massachusetts held that the broker was hable for failing to disclose an adverse interest.
 
 Id.
 
 at 644. The Fourth Circuit stated a corollary to this holding when it ruled that an agent could have an interest adverse to his principal without breaching his fiduciary duty.
 
 Construction Techniques, Inc. v. Dominske,
 
 928 F.2d 632, 638 (4th Cir.1991). But the absolute prohibition against having such adverse interest only disappears when the agent discloses the conflicting interest and the principal consents to the conflict.
 
 Id.
 

 The Southern District of Ohio ruled on a similar situation in denying a defendant’s motion for summary judgment, but found liability based on a tort theory.
 
 General Acquisition, Inc. v. GenCorp,
 
 766 F.Supp. 1460 (S.D.Ohio 1990). Fraudulent nondisclosure could result when an agent failed to disclose a client relationship with a company at the time he was advising his primary client about taking over that company.
 
 Id.
 
 at 1475-76. The agent could be held liable for suppressing a fact that could induce the principal “to establish or continue the relationship.”
 
 Id.
 
 at 1476.
 

 This analysis indicates the tension that can occur between the typical case of omission and the omission at bar. Often, the nondisclosure does not exist as a wrong on its own but becomes actionable because of its relationship to other information that was disclosed. An example of this wrong would be giving a client financial records from some prior quarters but not from others because of what those reports indicate when considered in conjunction. But O’Higgins’ nondisclosure does not make prior statements misleading or untrue. Instead, the omission is a full and complete harm that creates a false impression of objectivity behind all of O’Higgins’ investment decisions.
 

 In
 
 Gussin v. Shockey
 
 a horse agent was held liable for telling his principal that the horses cost more than the agent paid for them and keeping the difference between the real price and the revealed price. 725 F.Supp. 271 (D.Md.1989),
 
 affd,
 
 933 F.2d 1001 (4th Cir.1991). As a defense the agent testified that he had bought horses that were undervalued and that the hidden “commission” he received (in addition to his normal fee) only brought the priee into line with the horse’s real value.
 
 Id.
 
 at 274. In refuting this defense, the District of Maryland wrote that an agent must disclose any personal interest and possible benefit the agent has or might receive even if the transaction is ultimately for the good of the principal.
 
 Id.
 
 at 275. Even if the agent’s additional commission did bring the price to the true market value (the negotiated price presumably being low because of the agent’s own horse-sense), he had a fiduciary duty to act wholly in the plaintiffs interests and to reveal any divergent interest.
 
 Id.
 

 Likewise, O’Higgins can claim that he thought he was making the best possible investment for CDPHP. Regardless of these intentions, O’Higgins still had a duty to reveal conflicts of interest even if he had a good faith belief that he could overcome that conflict and retain his objectivity in making investment decisions. Even assuming the best intentions on O’Higgins’ part, he is still required to disclose any and all conflicts of interest.
 

 Cases that specifically deal with brother-brother conflicts of interest use a similar analysis. In
 
 SCA Servs. v. Morgan,
 
 557 F.2d 110 (7th Cir.1977), the Seventh Circuit ruled that a district judge had to recuse himself from a case where his brother was a partner in the firm that was representing one of the parties. The Seventh Circuit began from the premise that brothers are close and are inclined to support each other’s interests.
 
 Id.
 
 
 *1005
 
 at 116. The “appearance of partiality” and public perception concerns that resulted from the relationship led the court to issue a writ of mandamus recusing the judge even though it did not rule that the conflict of interest had affected his conduct in any way.
 
 Id.
 
 at 116, 118.
 

 Another brother-brother conflict of interest occurred in a situation more analogous to the one sub judiee. A trustee in a bankruptcy proceeding settled his brother’s claim against the bankrupt company before even the secured creditors were paid despite the fact that the brother’s claim was seventeen years old and had not been acted upon in that time.
 
 In re Combined Metals Reduction Co.,
 
 557 F.2d 179, 196 (9th Cir.1977). The court was not required to rule on whether the settlement reached constituted fraud; it was enough that the trustee had a fiduciary duty to avoid impropriety and the appearance of impropriety.
 
 Id.
 
 at 196. Although the trial court had nothing but praise for the trustee and stressed that in all likelihood he could have kept his objectivity, the Ninth Circuit held that nondisclosure of so patent a conflict of interest was still a breach of duty.
 
 Id.
 
 at 197.
 

 A similar situation occurred in a case involving an accountant’s investigation of a company, one of whose officers was his brother-in-law.
 
 In re Colonial Ltd. Partnership,
 
 854 F.Supp. 64 (D.Conn.1994). Although ethical rules applicable to accountants were predicated on an assumption of the accountant’s independence, that presumption could be and was overcome by the existence of a familial relationship with one of the interested parties.
 
 Id.
 
 at 95-96. A possible conflict of interest clearly could exist because of the presence of the family relationship. The specter of a fiduciary’s loss of objectivity carried too much weight to be ignored.
 
 Id.
 

 For the foregoing reasons, the court holds that the defendant had the duty to disclose that the PAC-IO was purchased from his brother.
 

 3. Nondisclosure
 
 As
 
 a Material Breach
 

 In order for a breach of fiduciary duty based on an omission to be actionable, the nondisclosure must be material. The standard of materiality for omissions has been set by the Supreme Court and followed by both New York State courts and Second Circuit courts.
 

 In deciding a 10b-5 action, the Supreme Court considered the issue of misstatements of material fact.
 
 Affiliated Ute Citizens of Utah v. United States,
 
 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). In doing so, it established a test for materiality. In order for a fact to be material, it is necessary that a reasonable investor might consider it important in making a decision.
 
 Id.
 
 The Court again visited the issue of the materiality of nondisclosures in a shareholder derivative suit.
 
 TSC Industries v. Northway, Inc.,
 
 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). In deciding whether the object of a takeover bid breached its duty to its shareholders by not releasing information about the negative aspects of the proposal, the Court held that an omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote. The omission had to satisfy one of two tests: (1) whether there was a substantial likelihood that the omission would have “actual significance in the deliberations of a reasonable investor,” or (2) whether there was a substantial likelihood that the omission “significantly altered the ‘total mix’ of information made available.”
 
 Id.
 
 at 449, 96 S.Ct. at 2132.
 

 The Supreme Court overturned the trial court’s grant of summary judgment; in that case, facts had been omitted but they were readily available to the shareholder plaintiffs.
 
 Id.
 
 at 452, 96 S.Ct. at 2134. Summary judgment only could be granted if the omission was of such obvious importance that the trier of fact could only come to one decision concerning materiality.
 
 Id.
 
 at 450, 96 S.Ct. at 2133.
 

 The Second Circuit materiality test follows closely the one promulgated by the Supreme Court. In
 
 Folger Adam v. PMI Industries,
 
 938 F.2d 1529 (2d Cir.),
 
 cert. denied,
 
 502 U.S. 983, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991), the court subscribed to the “total mix” theory of materiality, stressing that the omission need not be outcome determinative in order
 
 *1006
 
 to be considered material.
 
 Id.
 
 at 1533. In that case, another incident of a lawsuit in the wake of a takeover bid, PMI and Salomon Brothers did not reveal PMI’s correct earnings for the two quarters leading up to the takeover.
 
 Id.
 
 at 1531.
 
 See also Field v. Trump,
 
 850 F.2d 938, 949 (2d Cir.1988) (citing
 
 TSC v. Northway
 
 and using the “total mix” test).
 

 In terms of the omission having “actual significance in deliberations,” CDPHP raises questions that would have been asked of O’Higgins in the heightened scrutiny that would have followed disclosure of the apparent conflict of interest of buying securities from one’s brother. For example, CDPHP would have questioned why O’Higgins chose a PAC-IO rather than another interest-sensitive security, why he bought it from First Albany, why he did not study PAC-IO characteristics, and why he did not barter for a better price. Pl.’s Repl.Mem.Law, Doc. 66, at 16. It is clear that a reasonable investor would consider it important that his adviser was purchasing a security from the adviser’s sibling. The omission certainly alters the “total mix” of information and would at the very least raise the eyebrows of the investor. A reasonable trier of fact could not label the omission immaterial and this court will not hold otherwise.
 

 A
 
 Requirement of Proof of Causation For Damages
 

 There is less consensus on the issue of causation of damages in the wake of a fiduciary breach than any of the other elements of the cause of action. Some courts have held that there must be proof of a specific causal connection between the breach and the loss for which the plaintiff seeks to recover.
 
 See, e.g., Havoco of America v. Sumitomo Corp. of America,
 
 971 F.2d 1332 (7th Cir.1992) (requiring proof of proximate cause for damages while applying Illinois law);
 
 Naviera Despina, Inc. v. Cooper Shipping Co.,
 
 676 F.Supp. 1134 (S.D.Ala.1987) (requiring but not finding a proximate causal connection between the breach of fiduciary duty and the loss that resulted). Other courts have imposed similar causation requirements but allowed a wider array of losses once a connection is proved.
 
 See, e.g., In re Imperial ‘400” Nat.,
 
 456 F.2d 926 (3rd Cir.1972) (a trustee who violates a duty owes loss in value of the trust resulting from the breach, any profit made through the breach, and any profit which would have been made had there been no breach). Still other circuits place the burden of proof on the defendant to disprove the causation in the wake of a breach of trust.
 
 See, e.g., Whitfield v. Lindemann,
 
 853 F.2d 1298 (5th Cir.1988),
 
 cert. denied,
 
 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 986 (1989) (defendant is not chargeable with loss that would have occurred even if there had been no breach but is responsible for disproving causal connection between breach and loss once the loss is established).
 

 Plaintiffs cite two cases for the proposition that New York law requires a lower standard of damages causation in the wake of a breach of fiduciary duty. The precedent to which plaintiffs and many other courts cite is
 
 Diamond v. Oreamuno,
 
 301 N.Y.S.2d 78, 24 N.Y.2d 494, 248 N.E.2d 910 (N.Y.1969). In that case, directors of a corporation used inside information to sell their shares of corporate stock before the information was released to the public. 301 N.Y.S.2d at 79-80, 248 N.E.2d at 911-12. The New York Court of Appeals held that the directors had no right to the profit they made from the sale because it was made based on secret knowledge.
 
 Id.
 
 at 81, 248 N.E.2d at 912. Although other stockholders had not been injured by the breach of fiduciary duty (it appears from the record that the directors did not own enough stock to cause a price change when they sold it), there was no need to prove causation in a breach of fiduciary duty claim when an injury was not sustained.
 
 Id.
 
 The directors had no right to retain profits gained through wrongdoing and the awarding of damages was “not merely to compensate the plaintiff for the wrongs committed by the defendant but ... to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit.”
 
 Id.
 
 (citation omitted).
 

 In the second case,
 
 ABKCO Music v. Harrisongs Music,
 
 the Southern District of New York held, and the Second Circuit affirmed,
 
 *1007
 
 that “but for” causation was not needed in order to recover damages for a breach of fiduciary duty. 508 F.Supp. 798, 803 (1981),
 
 affd,
 
 722 F.2d 988 (2d Cir.1983). In that case, good faith negotiations were in progress to settle a dispute between ex-Beatle George Harrison and a company who alleged that Harrison had plagiarized a song.
 
 Id.
 
 at 802. Harrison’s manager switched sides in the dispute and used his inside knowledge of his former client’s record sales in buying the right to sue his former client.
 
 Id.
 
 Based on his record sales information (indicating higher sales than the original plaintiff had used in calculating its settlement demand), he offered substantially more money to the original plaintiff than the musician’s last settlement offer.
 
 Id.
 

 The district court decided the defection of the former manager was to the “probable detriment” of the negotiations based on the circumstances.
 
 Id.
 
 at 803. The court believed that the plaintiff only needed to prove that “good faith negotiations were in progress and ... an eventual settlement was a reasonable possibility.”
 
 Id.
 
 at 803 n. 15. It did not cite to any cases in selecting that standard of causation. The Second Circuit agreed that proof that the wrong proximately caused the injury was not needed.
 
 ABKCO Music v. Harrisongs Music,
 
 722 F.2d 988, 995-96 (2d Cir.1983). It cited
 
 Diamond
 
 in concluding that the “district judge is not required to find a ‘but for’ relationship” between the breach and the harm and that fiduciary duties are prophylactic rules meant to remove the incentive to breach.
 
 Id.
 

 The two foregoing cases indicate that New York law requires a loosened standard of causation in breach of fiduciary duty claims, but the circumstances of those eases are not entirely analogous to the case at bar. The
 
 Diamond
 
 court did not require proof of damages by the plaintiff because there were no damages to prove, only illicit profits to be recovered. The
 
 ABKCO Music
 
 court used a diminished standard of proof but did so in a situation where the breach, once discovered, was far more conspicuous and wrong on its face than that of O’Higgins’. Harrison’s former manager could not in good faith claim that he was acting in the principal’s best interest.
 

 But there are eases that speak more directly to the present circumstances. In the setting of a 10b-5 action, an investment adviser has been found liable for failing to disclose a material fact relating to the investment advice he gave his client.
 
 Chasins v. Smith, Barney & Co.,
 
 305 F.Supp. 489 (S.D.N.Y.1969),
 
 affd,
 
 438 F.2d 1167 (2d Cir. 1970). Because the client generally controlled his own account rather than allowing the adviser to have full discretion, the adviser did not need to reveal the resale price of typically traded bonds.
 
 Id.
 
 at 495. But a breach of the adviser’s fiduciary duty did occur when he failed to tell the client that he was the market-maker in a particular security.
 
 Id.
 
 The district court awarded the plaintiff “the damages resulting from the violations,” — the money he lost on the securities bought through his “reliance” on the broker’s omission.
 
 Id.
 
 at 496. In affirming the decision, the Second Circuit explained that the reliance the trial court had found was analogous to a causation in fact inquiry, and either was enough to sustain the award of damages. 438 F.2d at 1172.
 

 In a recent 10b-5 action,
 
 Burke v. Jacoby,
 
 the Second Circuit examined the reliance and general causation standards necessary for a securities action, and held that transaction causation (the requirement that the breach be the cause of the securities trade at issue) can be presumed in the case of a material omission. 981 F.2d 1372, 1379 (2d Cir.1992),
 
 cert. denied,
 
 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993). If there was a material omission — that is if a reasonable investor might consider thé information that was not supplied important in making the investment decision — the plaintiff need not positively prove reliance.
 
 Id.
 
 Transaction causation may be presumed. But the plaintiff still would need to prove causation as to the loss and the trial court dismissed the action because the plaintiff had offered no evidence that she would have acted differently and avoided the loss had she been given the information.
 
 Id.
 
 at 1379-80.
 
 [3]
 
 CDPHP, on
 
 *1008
 
 the other hand, has asserted the questions it would have asked had it known of the conflict of interest and indicated that it would have scrutinized the purchase had adequate answers not been supplied. Pl.’s Repl.Mem. Law, Doc. 66, at 16.
 
 Contra Northwestern Nat. Ins. Co. v. Alberts,
 
 769 F.Supp. 498 (S.D.N.Y.1991) (court in dicta wrote that the plaintiff had to show transaction causation but not loss causation in order to win damages for a fiduciary breach).
 

 The Second Circuit’s decision in
 
 Burke
 
 is a logical one; it would be difficult for a plaintiff to prove he relied on information that was not given to him. All he could do for proof would be to testify that he would have acted differently had the omission not been made. Having a presumption of transaction causation makes sense once the court decides that the omission was material.
 

 As for loss causation (the requirement that the breach of fiduciary duty must have caused the loss sustained), the Second Circuit dealt extensively with breach of fiduciary duty and its relationship to fraud claims in
 
 Diduck v. Kaszycki & Sons Contractors,
 
 974 F.2d 270 (1992). In an action seeking damages for fraud, there must be (1) a material false representation or omission of existing fact (2) made with knowledge of its falsity (3) with intent to defraud (4) that causes reasonable reliance and (5) damages the plaintiff. Echoing its
 
 Chasms
 
 affirmance, the court labeled the fourth element congruent to “causation in fact” but wrote that the fraud need not be the exclusive inducing cause.
 
 Id.
 
 at 278. As for fraud damages, the “same causal connection is required between a breach of fiduciary duty and the loss alleged.”
 
 Id.
 
 at 279. In that case, the plaintiff, who had the burden of proof, failed to establish at trial that the investment funds were “worse off’ as a result of the fraud. “Speculative damages cannot support a cause of action for fraud.”
 
 Id.
 

 More recently, the Second Circuit used a “substantial factor” test to clear up the standard for proof of loss and damage causation.
 
 Milbank, Tweed, Hadley & McCloy v. Boon,
 
 13 F.3d 537, 543 (2d Cir.1994). An attorney had breached his fiduciary duty to his client by switching sides in negotiating a transaction. What would have cost his former client $8.5 million cost the client $10.5 million when the attorney began representing the seller.
 
 Id.
 
 at 542. In awarding $2 million in damages, the court held that but for causation was not required; fiduciary duty rules were meant to serve as a prophylactic and not simply to compensate for damages in case of a breach. Fiduciary breaches “in any context” comprise special eases “that often loosen normally stringent requirements of causation and damages.”
 
 Id.
 

 The problem with the case at bar is that it is difficult to set a baseline to determine proper damages. Even a properly made investment in a security that clearly fit within the investment plan could have lost money. If O’Higgins wanted to “make a play” on rising interest rates, he could have found an investment through another source and invested in a security within CDPHP’s guidelines. A security of this type would have lost money even though it was within the plan as interest rates continued to fall in 1993. There could be no guarantee that the $5 million investment would have retained its value in any investment scheme wherein the adviser was banking on a rebound of interest rates. Accepting this hypothetical as likely if the PAC-IOs were not bought, $2.4 million seems excessive.
 

 On the other hand, most of CDPHP’s O’Higgins’ portfolio did perform well and did make money. Even factoring in the PAC-IO loss, O’Higgins’ overall investments for CDPHP made a profit overall. Collins Dep., Doe. 68, at 80. The court could determine the average return O’Higgins made on in
 
 *1009
 
 vestments for CDPHP (with or without the PAC-IO investment factored in) and award damages based on that figure. In that case, damages would be more than $2.4 million.
 

 However, both scenarios are completely speculative. It cannot be known what alternative return or loss the $5 million would have made for CDPHP if the PAC-IO investment was rejected: “In the absence of evidence as to the true value of the securities sold to the plaintiff, the proper measure of damages is the loss to the plaintiff upon resale of the securities sold to him.”
 
 Chasms,
 
 305 F.Supp. at 496. In the matter at bar, evidence of what would have transpired had the $5 million not been invested in the PAC-IOs is absent. This court will therefore restrict the damages calculation to what did happen, and award damages for the loss that defendant’s material nondisclosure was a “substantial factor” in causing.
 
 Milbank,
 
 13 F.3d at 543.
 

 O’Higgins should not have made the PAC-IO investment without informing CDPHP of the conflict of interest. CDPHP’s loss was substantially caused by O’Higgins omission. It could not ask the questions it would have asked. It could not veto the investment before it was made or as soon as it was made because of that omission. Award of the difference between the cost of the investment and its final sale price, minus any interest payments the PAC-IOs made, will return the plaintiff to the position it was in before the breach of fiduciary duty occurred.
 

 D. Ratification
 

 Defendant O’Higgins seeks summary judgment based on the affirmative defense that CDPHP ratified his investment strategy. Defs.’ Not. of Mot., Doc. 42. This could be a successful defense even if the investment in PAC-IOs was unauthorized.
 
 Richardson Greenshields Secs. Inc. v. Lau,
 
 819 F.Supp. 1246, 1259 (S.D.N.Y.1993). New York law is clear as to the test for ratification. The Second Circuit, interpreting New York law, held that ratification requires (1) the acceptance by the principal of the benefits of the transaction (2) with full knowledge of the facts (3) under circumstances that indicate an intention to adopt the unauthorized agreement.
 
 Monarch Insurance Co. v. Insurance Corp. of Ireland,
 
 835 F.2d 32, 36 (2d Cir.1987).
 
 See also Banque Arabe Et Internationale D’Investissement v. Maryland Nat. Bank,
 
 850 F.Supp. 1199, 1213 (S.D.N.Y.1994),
 
 affd,
 
 57 F.3d 146 (2d Cir. 1995);
 
 Julien J. Studley v. Gulf Oil Corp.,
 
 282 F.Supp. 748, 752 (S.D.N.Y.1968),
 
 rev’d on other grounds,
 
 407 F.2d 521 (2d Cir.1969).
 

 CDPHP could not have had full knowledge of the facts as a result of O’Higgins nondisclosure of his purchase of the securities through his brother.
 
 See Merex A.G. v. Fairchild Weston Systems,
 
 810 F.Supp. 1356 (S.D.N.Y.1993) (citing 2 N.Y.Jur.2d Agency §§ 174, 247 for the proposition that the principal must have full knowledge of the agent’s act in order to have the ability or duty to ratify or renounce the action),
 
 affd,
 
 54 F.3d 765 (2d Cir.),
 
 cert. denied,
 
 — U.S. -, 116 S.Ct. 302, 133 L.Ed.2d 208 (1995). This court already has established the materiality of the nondisclosure of the brother relationship. As a result, O’Higgins fails to establish the second requirement and his summary judgment motion must fail.
 

 Defendant has argued that Diane Bergman, CDPHP’s executive director, did not order O’Higgins to immediately divest CDPHP’s investment in the PAC-IO. She merely told him to buy no more of the security until its legitimacy was cleared with a state insurance authority. O’Higgins Mem. Law, Doe. 43, at 7; FCM, Mar. 19,1993, at 4. This could indicate an acceptance of the benefits (or in this case, the risks) of the transaction that already had occurred. Doing so during a meeting of the Committee was a circumstance where one would expect an adoption of O’Higgins unauthorized actions to take place. In addition, O’Higgins argues that Tom Collins, chairman of the Committee, further ratified the transaction after it was made by his positive remarks about the 13% interest the investment was returning despite its riskiness. O’Higgins Mem.Law, Doc. 43, at 7-8.
 

 Tom Collins, director of CDPHP, interpreted the statement differently. He stated that Bergman, despite being director of the
 
 *1010
 
 plan, was not a member of the Committee and did not vote in its deliberations. Collins Aff., Doc. 48, ¶ 8. Telling O’Higgins not to buy more was not a ratification of the prior investment but a prohibition “in no uncertain terms” from making a further investment.
 
 Id.
 
 ¶ 9. As for Collins’ own statement, he characterized it not as ratification but as merely trying to give an accurate picture of CDPHP’s options in the wake of the breach.
 
 Id.
 
 ¶ 4. As a result, material issues of fact remain as to the first and third elements of ratification.
 

 However, even assuming the above arguments satisfy the first and third elements of the defense of ratification, O’Higgins’ failure to disclose the circumstances of the PAC-IO’s purchase to the Committee negates the second of the three required elements: CDPHP could not have full knowledge of the facts. All three elements are needed to support a ratification defense. As a result, the statements of Bergman and Collins cannot be the basis of a ratification defense. O’Higgins did not inform CDPHP that he had bought the PAC-IO from his brother, and this nondisclosure of a material circumstance of the transaction precluded CDPHP from having complete knowledge of O’Higgins’ actions. When “undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial.”
 
 Burke v. Jacoby,
 
 981 F.2d 1372, 1379 (2d Cir.1992). O’Higgins’ motion for summary judgment based on the affirmative defense of ratification must be DENIED.
 

 E. Other Motions for Summary Judgment
 

 In addition to the claims already discussed, there are cross-motions for summary judgment on the first and fourth causes of actions, which are the breach of contract and section 10(b)/rule 10b-5 claims, respectively. Defendant O’Higgins has moved for summary judgment on the seventh, eighth, and tenth causes of action, those being the control person liability, vicarious liability, and negligence claims. Defendant David Oberting, O’Higgins’ employee and codefendant, has moved for summary judgment on the third and fifth causes of action, namely, the breach of fiduciary duty and section 10(b)/ rule 10b-5 violations claims.
 

 The court has treated the Investment Advisers Act and fiduciary duty claims thoroughly because no significant facts are disputed with respect to those issues. The same can be said regarding the ratification defense. As for the balance of the pending motions, it suffices to say that material factual discrepancies preclude summary judgment upon those claims. For the most part, all other motions before the court necessarily require resolution of the central factual dispute of whether the PAC-IOs conform to CDPHP’s investment policy. The cacophonous discord of the experts convinces this court that this issue cannot be decided before trial.
 

 1. Cross-Motions on Breach of Contract Claim
 

 Although an Investment Management Agreement exists that grants O’Higgins complete discretion in investing on behalf of CDPHP, there is a material dispute as to whether the Investment Policy promulgated by the Committee was part of the original agreement or was incorporated based on the further actions of the parties.
 
 Compare, e.g.,
 
 Pl.’s Mem.Law in Opp’n, Doc. 52, at 5-6
 
 with
 
 O’Higgins Mem.Law, Doc. 43, at 12-15. Moreover, even if the Investment Policy is part of the contract, there is a serious dispute between the experts as to whether O’Higgins complied with the policy’s requirements.
 
 Compare, e.g.,
 
 Pl.’s Mem.Law, Doc. 62, at 21-29
 
 with
 
 Defs.’ Mem.Law in Opp’n, Doc. 64, at 11-17. As such, the cross-motions for summary judgment based upon breach of contract must be DENIED.
 

 2. Cross-Motions on Section 10(b) and Rule 10b-5 Claims against O’Higgins
 

 As for the antifraud causes of action, plaintiff admits that it must prove scienter as one of the elements of that cause of action, but argues that the record contains no issues of material fact. Pl.’s Mem.Law, Doc. 62, at 39. Scienter need not rise to the total intent required to establish fraud.
 
 Ades v. Deloitte & Touche,
 
 799 F.Supp. 1493,
 
 *1011
 
 1498-99 (S.D.N.Y.1992). Yet even the lesser standard of “intent to defraud, knowledge of the falsity, or a reckless disregard for the truth,”
 
 id.,
 
 has not been established for the purpose of a summary judgment motion.
 
 Compare, e.g.,
 
 Defs.’ Mem.Law in Opp’n, Doc. 64, at 28-30
 
 with
 
 Pl.’s Repl.Mem.Law, Doc. 66, at 13-14. The experts of each party have clashed repeatedly as to whether the PAC-IO was a government security, whether it was a fixed or variable-income security, and whether its maturity was greater than 10 years.
 
 Compare, e.g.,
 
 Pl.’s Mem.Law, Doc. 62, at 21-29
 
 with
 
 Defs.’ Mem.Law in Opp’n, Doc. 64, at 11-17. As a result, the motion for summary judgment based on section 10(b) and rule 10b-5 must be DENIED.
 

 3. O’Higgins Motion on Negligence Claim
 

 Defendant O’Higgins has argued that CDPHP cannot maintain a breach of contract and negligence claim concurrently. O’Higgins Mem.Law, Doc. 43, at 15-17. While it is true that New York law requires a duty distinct from that created by the contract,
 
 see, e.g., RKB Enterprises, Inc. v. Ernst & Young,
 
 182 A.D.2d 971, 972, 582 N.Y.S.2d 814 (N.Y.App.Div.1992), plaintiff has in fact alleged that O’Higgins negligently breached a distinct duty in his management of the investment fund. Plaintiff has argued that the role of an investment adviser creates an independent duty analogous to that of lawyer and client. Am.CompL, Doc. 29, ¶ 120; PL’s Mem.Law in Opp’n, Doc 52, at 33-24. The argument is not enough to establish the negligence claim without more substantive proof at trial, but it is enough to preclude summary judgment for the defendant on the claim. As a result, defendant’s motion for summary judgment on the negligence claim is DENIED.
 

 4. Oberting Motion on Breach of Fiduciary Duty Claim
 

 Plaintiff and defendant assert wildly divergent roles for David Oberting in the events surrounding the PAC-IO purchase. Plaintiff alleges that Oberting admitted to serving as CDPHP’s stockbroker and that he was an integral part of the sale of the PAC-IO because of the information he provided to CDPHP concerning the security. PL’s Mem. Law in Opp’n, Doe. 52, at 29. Defendant, on the other hand, portrays Oberting as a mere conduit for the investment decisions made by O’Higgins. Oberting exercised no discretion with regards to the purchase, and his provision of information about the security after it was purchased was immaterial since CDPHP could not rely on the information after the purchase had been made. Oberting Mem. Law, Doc. 45, at 7-8. Clearly, issues of fact remain as to the third cause of action. The defendant’s motion for summary judgment with respect to the fiduciary duty claim against Oberting must therefore be DENIED.
 

 5. Oberting Motion <m Section 10(b) and Rule 10b-5 Claim
 

 The same scienter requirement exists with respect to the fifth cause of action as with the cross-motions by CDPHP and O’Higgins with respect to the fourth cause of action. Once again, CDPHP asserts that Oberting was a key figure in the PAC-IO purchase and knew as much, while Oberting claims his conduct was meant to aid CDPHP and evidenced no wrongful intent.
 
 Compare, e.g.,
 
 Oberting Mem.Law, Doc. 45, at 11-13
 
 with
 
 PL’s Mem.Law in Opp’n, Doe. 52, at 31-32. Summary judgment for defendant Oberting on the fifth cause of action concerning those same federal security law violations must therefore be DENIED.
 

 6. O’Higgins Motions on Control Person Liability and Vicarious Liability Claims
 

 Material issues of fact remain as to defendant Oberting’s liability. The court cannot determine O’Higgins’ motion for summary judgment on the control person liability and vicarious liability claims until it determines Oberting’s liability. As a result both motions for summary judgment must be DENIED.
 

 III. CONCLUSION
 

 The court GRANTS plaintiff CDPHP’s motion for summary judgment upon its second cause of action, that is, upon its claim
 
 *1012
 
 that defendant O’Higgins breached his fiduciary duty. Summary judgment upon the other claims asserted by plaintiff is DENIED. Defendants’ motions for summary judgment are also DENIED.
 

 The parties are directed to prepare for trial.
 

 It is So Ordered.
 

 [1]
 

 . Because the Investment Advisers Act claim was set forth as a cause of action in the original complaint, Doc. 1, ¶¶ 115-18, the court rules that for purposes of computation of the limitations period for that claim, the date of filing is January 18, 1994, and not the December 12, 1994 filing date of the amended complaint, Doc. 29.
 

 [2]
 

 . Many circuits also have a test that is used when neither state nor federal law establishes an explicit duty of disclosure (although that duty is established by New York law as has been shown here). It is usually stated as a test of five nonexclusive factors and considers (1) the relationship of the defendant to the plaintiff, (2) the defendant’s access to the information compared to the plaintiff's access to that information, (3) the benefit the defendant derives from his relationship with the plaintiff, (4) the defendant's awareness of the plaintiff's reliance, and (5) the defendant’s activity in initiating the transaction.
 
 See, e.g., Camp v. Dema,
 
 948 F.2d 455, 460 (8th Cir.1991);
 
 *1004
 

 Roberts v. Peat, Marwick, Mitchell & Co.,
 
 857 F.2d 646, 653-654 (9th Cir.1988),
 
 cert. denied,
 
 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989).
 

 The court is of the opinion that analysis under this approach would still result in a finding that defendant was obliged to disclose the conflict as a matter of law.
 

 [3]
 

 . The Fifth and Eighth Circuits are in accord with this assessment of causation. In
 
 Akin
 
 v.
 
 Q
 
 
 *1008
 

 L Investments,
 
 959 F.2d 521 (5th Cir.1992), the court of appeals held that there was a presumption of reliance in the face of a fiduciary’s omission of material fact that was not in effect when there was a positive misrepresentation of material information. However, that presumption was rebuttable if the fiduciary could show that there was not actual reliance and that the investment decision would not have been different had the information been revealed. In
 
 Arthur Young & Co. v. Reves,
 
 937 F.2d 1310 (8th Cir.),
 
 affd,
 
 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1988), the court held that 10b-5 actions require transaction and loss causation but a failure to disclose results in a rebuttable inference of transaction causation.